2019 IL App (1st) 170544
No. 1-17-0544
Opinion filed September 30, 2019

FOURTH DIVISION

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 14 CR 9255 |
| AHBIR SARDIN, | ) ) | The Honorable Thomas V. Gainer, Jr., |
| Defendant-Appellant. | ) | Judge, presiding. |

PRESIDING JUSTICE GORDON delivered the judgment of the court, with opinion.
Justice Reyes concurred in the judgment and opinion.
Justice Lampkin specially concurred, with opinion.

**OPINION**

¶ 1    After a jury trial, defendant Ahbir Sardin, 17 years old, was convicted of the first degree murder of Venzel Richardson, 14 years old, during a drive-by shooting and sentenced to 40 years in the Illinois Department of Corrections (IDOC).

¶ 2 Defendant claims: (1) that the trial court erred by overruling defense objections to the State's introduction of the names and nicknames of two local rappers, Clint Massey, also known as Rondonumbanine, and Courtney Ealy, also known as C-Dai, who were with defendant the day before the shooting and who had been convicted of another murder two months prior to defendant's trial; and (2) that the State elicited testimony that a police detective spoke with the mother of an eyewitness, returned to the police station and generated a photo array with defendant, thereby creating the inference of an inadmissible out-of-court identification by the mother.

¶ 3 The State responds, among other things, (1) that the two rappers were relevant to the course of the police investigation of this offense because, the day before, they and defendant were stopped by the police in a van that witnesses identified as the same type of vehicle used in this drive-by shooting; and (2) that the detective did not testify to an identification by the mother and he subsequently explained how defendant, in fact, became a suspect.

¶ 4 For the following reasons, we affirm.

¶ 5 BACKGROUND

¶ 6 I. Pretrial Proceedings

¶ 7 On May 28, 2014, defendant was indicted for the murder of Venzel Richardson, during a drive-by shooting on February 12, 2014.

¶ 8     On September 8, 2016, defendant filed several motions, including a motion *in limine* to bar the State from mentioning a rapper known as Chief Keef. Defendant argued that the State intended to present identification testimony that Darrell Johnson, an event witness, had recognized defendant from a rap music video by Chief Keef. Defendant argued that the fact that it was a Chief Keef video was irrelevant for identification purposes and that mentioning Chief Keef would unfairly prejudice defendant at a jury trial. Defendant argued that "Chief Keef had recently been repeatedly affiliated and even blamed for gang violence in Chicago in both local and national press." In support, defendant's motion cited numerous newspaper articles, including articles from the New York Times and the Chicago Tribune.

¶ 9     On September 8, 2016, defendant also moved *in limine* to bar certain firearms evidence. Defendant argued that the eight cartridge cases recovered from the scene of this shooting were sent to the Illinois State Police for comparison to other cartridge cases found on the scene of other shootings; and that four of the cartridges in this case were found to have been fired from the same firearm that had fired cartridge cases in three other shootings. Defendant argued that, since defendant had not been charged in those other cases, this firearms evidence was not relevant and was highly prejudicial.

¶ 10    On September 8, 2016, defendant also moved *in limine* to bar: (1) gang membership evidence and (2) other crimes evidence, namely, identification testimony by event witnesses Darrell Johnson and Keyshone Bowie that they had recognized defendant from a time when the three of them were all locked up in the same Chicago police station on a prior date.

¶ 11    On September 12, 2016, the State indicated that it had no objection to defendant's motion barring gang evidence, and the trial court granted it. With respect to the other crimes evidence, the trial court ruled that the State had the right to establish that the witnesses had observed defendant on other occasions but the State was not "allowed to use the fact that they saw him in a police station."

¶ 12    On September 13, 2016, the State indicated that it had no objection to defendant's motion barring certain firearms evidence, and the trial court granted that motion. With respect to the motion concerning Chief Keef, the trial court ruled that the State could elicit that the witnesses recognized defendant from a music video "but without the words, 'Chief Keef.' " The trial court explained: "As far as [Chief Keef's] connection to gang violence *** I know about it, and I just know about it because I read the papers every day, so I fear that allowing this to come in with the mention of Chief Keef could be prejudicial."

¶ 13                                    II. Trial

¶ 14          The jury trial began on September 13, 2016, and the State's first witness

was Laveta Richardson, the victim's mother, who identified a photograph of her

son.

¶ 15                              A. Darrell Johnson

¶ 16                              1. Direct Examination

¶ 17          The State's second witness, Darrell Johnson, age 16 at trial, identified

defendant in court as someone whom he knew from social media and music

videos as D-Rose.  On February 12, 2014, at 8 p.m. Johnson was with:  (1) his

brother, Keyshone Bowie;[1] (2) the victim, Venzel Richardson, who was a friend

from grammar school; (3) Jarron George, who was a friend of his brother's; and

(4) Joseph Belchor, also known as White Mike, who was also a friend from

grammar school.  Belchor has since died in an automobile crash. The group had

just come from a convenience store at 61st Street and King Drive in Chicago,

and they were walking down Vernon Avenue, between 61st and 62nd Streets,

toward the victim's house.   Johnson and the victim were walking in the street,

while the others walked on the sidewalk.  As the group reached the middle of

the block, Johnson observed a white van turn into the block.  Johnson identified

---

[1] Johnson testified that his brother was presently 18 years old, but did not testify to his brother's birthdate. However, his brother later testified at trial to his own birthdate and that he was actually 19 years old.

a photo of a white van as looking like the white van that he had observed that night. The photo was admitted into evidence without objection.

¶ 18    Johnson testified that, after the van slowed down, the door behind the driver's side slid back, and shots were fired from the van. Johnson was approximately 10 feet from the door when it slid open. Johnson did not look toward the open door and, thus, did not observe anyone inside the van. Instead he just ran. Both he and his friends ran toward 61st Street. After one gunshot, his ears started ringing and he held his ears as he ran. Johnson observed the victim laying in a gangway, on his stomach, face down in the snow, with blood on him. When Johnson's brother, Bowie, turned the victim over, Johnson could not look and walked away. Johnson remained at Vernon Avenue and 61st Street until the police and paramedics arrived, but he did not speak to the police then, choosing instead to return home. Later that night, police officers came to his home to speak to him and he told them what had happened. At that time, he did not state that D-Rose had shot the victim.

¶ 19    Johnson testified that, on February 15, 2014, police detectives came to his home again, so he could view a couple of photo arrays. Johnson was only 13 years old at the time, so his mother was present. Both he and his mother signed an advisory form explaining that he did not need to select anyone from the photo arrays. In court, Johnson identified: (1) his and his mother's signatures

on the form; (2) the photo arrays as the ones he had viewed; and (3) one of the photos in the first array as a photo of D-Rose. However, at trial, Johnson denied making an identification of the shooter from the first photo array. With respect to the second array, Johnson denied recognizing anyone depicted in it and testified that none of the individuals depicted were in the white van on February 12, 2014.

¶ 20    On appeal, defendant claims that it was error for the trial court to allow the introduction of the names and nicknames of two local rappers, whose names were first introduced during Johnson's testimony. Since this is an issue on appeal, we provide, below, as much detail as we have from the transcript about these objections.

¶ 21    Johnson was asked if he knew Clint Massey, and defense counsel objected, whereupon the court held a sidebar which was not transcribed and not part of the record. Afterwards the trial court overruled the objection, and Johnson denied knowing anyone named Clint Massey. When the State asked if Johnson knew anyone by the nickname Rondonumbanine, defense counsel stated: "Objection. Same reason." After the court overruled the objection, Johnson testified that he had heard the name from the internet and rap music. When Johnson was asked if he knew a person named Courtney Ealy, defense counsel stated: "Objection. Same basis." The trial court again overruled the

objection, and Johnson replied no. However, Johnson did know the nickmame C-Dai. When he was asked how he knew that nickname, defense counsel stated: "Objection for the same reasons on the previous two questions." The trial court again overruled it, and Johnson explained that he knew that nickname from the "[i]nternet and songs."

¶ 22     Johnson testified that, on March 9, 2014, police detectives returned to his home to talk to him and his mother about the victim's murder, but he denied telling them who the shooter was. Johnson testified that he viewed another photo array; and he identified in court the array that he had viewed and another advisory form that he had signed. Johnson acknowledged that this was the same array that he had viewed and that D-Rose's photo had a circle around it and Johnson's initials on it, but Johnson denied placing the circle or his initials on it.

¶ 23     Johnson testified that, on March 26, 2014, he and his mother went to a police station, signed another advisory form and viewed a lineup. At trial, Johnson identified a photo of the lineup and acknowledged that D-Rose was in the photo, but he denied making an identification on March 26, 2014.

¶ 24     Johnson testified that he had previously viewed a surveillance video that truly and accurately depicted Vernon Avenue on February 12, 2014. The video was admitted into evidence without objection. As the video was played for the

jury,[2] Johnson testified that clip 2 depicted his brother Bowie, falling to the ground, and also Jarron George; that clip 3 depicted George running, immediately after the victim was shot, and Johnson walking; that clip 5 depicted Johnson and Bowie, as well as Belchor with a cell phone in his hand and George putting his hands over his face. Clip 5 also showed the arrival of a police officer and a person named Tyrece. Johnson testified that the video clips truly and accurately depicted what transpired on February 12, 2014.

¶ 25    Johnson testified that, on March 28, 2014, he and his mother went to a police station to meet with assistant State's Attorney (ASA) Lamas, and that Johnson told the ASA everything he remembered about the night of the murder. Johnson denied that the ASA asked for their consent to videotape a statement and denied that he agreed to do so. However, he admitted that they went into an interview room in order to have his statement videotaped. After entering the interview room, he had a conversation with the ASA and Detective Sipchen[3] and he was aware at that time that he was being videotaped.

¶ 26    Johnson testified that on February 12, 2014, when the victim was shot, the streetlights were on, but he could "not really" see at that time. At trial, he denied stating during the videotaped interview that: " 'It was light enough to

---

[2] The video depicts individuals reacting to and running from the shooting, but not the shooting itself.

[3] Detective Sipchen subsequently testified at trial that his first name was David.

9

see your faces right up. It was lighting up. The streetlights was light enough to brighten up the street.' "

¶ 27 At trial, Johnson admitted stating during the videotaped interview that, when the van approached, the door slid back, but denied having stated: that he was close to the van; that he could observe both someone in the driver's seat and another person in the van; that he knew the driver as J.B. and the other person as D-Rose; that D-Rose held a gun in his right hand that was silver on top with a black handle; that D-Rose pointed the gun at the victim who was in front of Johnson; that, at the moment D-Rose fired the first shot, Johnson was five feet from D-Rose; that the victim ran toward a gangway by 62nd Street but he was shot before he could reach it; that the victim was running when Johnson last observed him; that after Johnson ran, he looked back and observed the van driving off and turning right on to 63rd Street toward King Drive; that Johnson then walked back towards the victim; and that Johnson's brother flipped the victim over; and that Johnson walked away.

¶ 28 At trial, Johnson denied telling police during the videotaped interview that he provided the following reason for not selecting the shooter on February 15, 2014: " 'Because I was concerned if I point him out (inaudible) he was going to find out that I pointed him out or something.' "

¶ 29    Johnson identified a photo as a photo of D-Rose and identified his own signature on the photo, but denied that he signed it during the videotaped interview. Johnson denied stating during the videotaped interview: that he observed this person shoot the victim, and that he was sure " '[b]ecause [he had] seen him enough times to know his face.' " Johnson denied recognizing a six-photo array and denied recognizing his signature on it.

¶ 30    Johnson testified that he did not recall the police speaking to him at his home on March 9, 2014, although he had acknowledged this interview during his direct examination earlier in the day, before the lunch break. However, he now denied having testified previously on direct examination that he recalled the detectives coming to his home on March 9, 2014. He also denied answering questions about the March 9, 2014, interview during the videotaped statement, particularly that he had selected D-Rose's photo from an array on March 9, 2014, as the person who had shot the victim.

¶ 31    At trial, Johnson denied having stated during the videotaped interview that he had selected D-Rose from a physical lineup held on March 26, 2014, as the person who shot the victim. Johnson testified that he did not recall: coming to the courthouse on May 8, 2014, meeting with ASA Bob Mack, and testifying in front of the grand jury. Johnson identified a photo of D-Rose but denied that it was his signature on the photo or that he was shown it on May 8, 2014. He

also denied having viewed an array on May 8, 2014, and denied that was his signature on the array. Johnson denied ever having been before the grand jury. Johnson was handed a transcript and given time to read it, and then denied that it was a transcript of his testimony in front of the grand jury.

¶ 32 The prosecutor then read through most of the questions and answers before the grand jury, and Johnson denied having provided those answers. Before the grand jury, Johnson had testified about the approach of "a white Caravan" van and the shooting of the victim by D-Rose from the van, repeating substantially the same information that had been provided during the videotaped interview.

¶ 33 2. Cross-Examination

¶ 34 On cross-examination, Johnson testified that on February 12, 2014, the night of the shooting, he met with police detectives and told them everything he knew. His mother was present during that interview but she was not present during the videotaped statement and he could not recall whether she was with him during the grand jury proceeding. Johnson testified that his birthday was May 8, but he could not recall whether he testified before the grand jury on his birthday. Johnson testified that, after he viewed photos of a white van at his mother's house, there was nothing distinctive about the vehicle that made him believe that it was the same vehicle used in the shooting.

¶ 35                              B. Jarron George

¶ 36         Jarron George testified that he was presently 18 years old and a high school senior.   On February 12, 2014, he was 15 years old and a sophomore. At 8 p.m., on February 12, he was with a group of friends from the neighborhood:   the victim; Keyshone Bowie; Darrell Johnson; and Joseph Belchor.   They were coming from a store at 61st Street and King Drive, and walking down Vernon Avenue, from 61st Street toward 62nd Street.   That block on Vernon Avenue is residential, with street lights.   Johnson and the victim were walking in the street, while the other three were walking on the sidewalk.   A white minivan drove up, heading down the street in the same direction that the group was walking.   The van stopped in the middle of the street, right next to Johnson and the victim.   The door behind the driver's door slid open.   The driver's side was the side of the van closer to George.   When George first heard shots coming from the van, he observed the bottom of a dark-red pants leg and a hand holding the gun extending out of the vehicle. The sleeve of the shirt was white.   The door did not open "that far."   After hearing shots, George and Bowie turned around and ran back toward 61st Street. Johnson ran in the same direction that George and Bowie ran, but on the other side of the street. When George reached the corner of 61st Street, he looked over his shoulder and observed the victim running in the opposite direction,

toward a gangway. The victim's right arm was twisted, and he was falling. After the shots stopped, George, Bowie and Johnson ran to where the victim was, in the gangway, lying face-down in the snow. Bowie flipped the victim over, and George observed a hole in the right side of his head. No one in the group had a phone, so they yelled for help and the police later arrived. At some point, Belchor returned to the scene. After the police gave them permission to leave, George walked to his grandmother's house, where he was staying at the time. That evening, a police sergeant came to his grandmother's house, but George did not provide him with a description of the shooter. On February 15, 2014, George spoke with a police officer at Johnson and Bowie's house, where George provided a description of the shooter's clothing, namely, a red pants leg and a white sleeve. Neither George's mother nor grandmother were present. The police showed George a photo of a white van which George identified as the same type of van as the shooter's van. On March 26, 2014, George went to a police station with his mother and cousin to view a physical lineup. Prior to viewing it, George signed an advisory form and the police explained that he did not have to select anyone. George identified both the advisory form and a photo of the lineup that he had viewed.

¶ 37    At trial, George denied picking anyone out of the lineup on March 26, 2014. After viewing the lineup, he viewed a video taken the night of the

shooting and he identified himself running in the video. George acknowledged that one could not observe the van in the video. After viewing both the lineup and the video, George, with his mother present, spoke with an ASA and told him about the shooting, but George denied informing the ASA that defendant shot the victim. After the interview, George agreed to have his statement recorded. However, it was late by that point, so he went home. The next time he spoke to someone about the shooting was in May 2014, when he came with his mother to the courthouse and appeared in front of the grand jury. Before he went into the grand jury room, he spoke with an ASA with his mother present. Before testifying, he swore to tell the truth; and since testifying, he had an opportunity to review the transcript.

¶ 38    At trial, George denied having identified anyone before the grand jury. George acknowledged that the ASA asked him questions about the lineup during the grand jury proceeding. But George denied being asked the following questions and giving the following answers:

"Q. Did you identify somebody in that lineup?

A. No, I didn't say it was. I didn't point that person out as the direct shooter.

Q. You did point someone out though?

A. Yes. I said it was a possibility.

Q. After that lineup?

A. But I said I wasn't sure."

¶ 39     On cross, George testified that, on the night of the shooting, events happened very fast, it was dark and he ran. Later that night, he could not provide a description of the shooter's face to the police; and he did not identify defendant as the shooter before the grand jury.

¶ 40                          C. Keyshone Bowie

¶ 41     Keyshone Bowie testified that he was 19 years old, that the last grade of school he completed was his sophomore year of high school, and that Darrell Johnson was his younger brother. On February 12, 2014, at 8 p.m., Bowie was walking from a store on 61st Street with: (1) his brother, Darrell Johnson; (2) the victim, who was a friend from school; (3) Jarron George; and (4) Joseph Belchor, also known as White Mike, who Bowie knew from the "[n]eighborhood." The group was walking southbound on Vernon Avenue, from 61st Street toward 62nd Street. Bowie did not recall whether there were street lights.

¶ 42     Bowie testified that his brother noticed a white van and they "thought it was the police, so [they] ran." The van was heading southbound, in the same direction that they had been walking. As Bowie ran, he heard gunshots. After hearing gunshots, Bowie ran to a gangway and the victim ran to a different

gangway. Bowie observed the white van but he could not discern whether it had tinted windows. When shown a photo of a white van, he testified that it did not look similar to the white van that he had observed on the night of the shooting, because "[t]he van had things on top of the front of it." Bowie sat in the gangway until the shooting stopped, and then went to where the victim was located. The victim was face-down in the snow, and Bowie turned him over onto his back. When Bowie turned him over, Bowie observed that the victim was shot multiple times and had already passed away. Bowie waited until the police arrived but, when they arrived, he told them that he "wasn't there." He said this because he did not "want to deal with none of this." After speaking with the police on February 12, 2014, Bowie left the state and returned to Chicago only when the police "put a warrant" on him. When he returned to Chicago, he went to his mother's house, but he did not recall detectives visiting him at his mother's house on April 13, 2014. Bowie did recall viewing a photo array. Before viewing the array, he and his mother signed an advisory form and, in court, he identified their respective signatures on the advisory form dated April 13, 2014. Bowie also identified in court the array that he had previously viewed.

¶ 43       Bowie testified that he identified the photo circled on the array and that he had placed his initials there. Bowie testified that the photo was a photo of D-

Rose, and Bowie then identified defendant in court as D-Rose. Concerning the shooter, Bowie unequivocally testified:

"Q. Was D-Rose the individual that shot your friend?

A. Yes."

Bowie knew D-Rose from observing him on social media but denied having observed him in music videos.

¶ 44    Bowie testified that he recalled giving a videotaped statement but he denied knowing at the time that he was being videotaped. Bowie recalled meeting with an ASA and that the ASA asked Bowie if he minded being recorded. However, Bowie did not realize that the result would be a video. Bowie recalled that an ASA and a detective were present in the room while he gave his statement.

¶ 45    Bowie denied having stated in his videotaped statement that he started playing basketball with D-Rose when Bowie was 13 or 14 years old. However, he acknowledged having stated in his videotaped statement that, on February 12, 2014, at 8 p.m., he was with the victim; that, although it was dark, there were streetlights on and he "could see"; that he did not observe the van until it pulled up a little bit ahead of him; and that he heard the door slide back. Bowie denied stating that, when the van door slid open, he looked in the van and observed D-Rose's face. However, Bowie acknowledged having stated in his

18

videotaped statement that D-Rose " 'pointed the gun, he shot, boom. I hit the floor and I looked, then I ran. Then I ran towards the gangway.' " Bowie acknowledged having stated that he looked at D-Rose's face for three seconds, that Johnson, George and Belchor ran back the way the van had come, and that, when the shooting stopped, Bowie heard the door slam and Bowie rose and went to the gangway where the victim was lying.

¶ 46    Bowie acknowledged having stated in the videotaped statement that, on April 13, 2014, he had signed a "Lineup/Photo Spread Advisory Form." However, he denied having stated in the videotaped statement that the police had explained to him that he should not assume that they knew who the suspect was or that he was not required to pick someone out. Bowie acknowledged that on April 13, 2014, the detectives did not make any threats or promises in exchange for his statement and that his statement was freely and voluntarily given.

¶ 47    Bowie was then asked whether a police detective came to his home on April 25, 2015, and showed him a six-person photo array. Bowie denied recognizing People's Exhibit 31, which is a six-person photo array. Bowe was then asked the following questions which are at issue on this appeal:

"Q. Is this a photo array with six individuals in it?

A. Yes.

Q. And do you know a person with the nickname Rondonumbanine?

DEFENSE COUNSEL:  Objection.

THE COURT:  Overruled.

A. No.

Q. Do you know [a] person with the nickname C-Dai?

DEFENSE COUNSEL:  Objection.

A. No.

THE COURT: Overruled."

¶ 48    Bowie did not recall testifying before the grand jury, or being in a room with a court reporter taking down everything that an ASA was asking, or taking an oath to tell the truth in May 2014, or reviewing his grand jury transcript. Bowie recalled only being questioned by police officers.  The ASA then read the grand jury transcript into the record, stopping periodically to ask Bowie if he had been asked those questions and provided those answers before the grand jury, and he denied it each time. The grand jury transcript contained substantially the same information as Bowie's videotaped statement. Before the grand jury, Bowie identified D-Rose as the shooter and explained that he recognized D-Rose because they had played basketball together when Bowie was 13 years old.

¶ 49  The grand jury transcript also contained information concerning Bowie's failure to appear in response to a subpoena in this case. Before the grand jury, Bowie testified that he had received a subpoena to appear before the grand jury, but he ignored it; that he was subsequently arrested on May 15, 2014, in Wisconsin for his failure to appear; and that he waived extradition to return to Illinois to appear before the grand jury. At trial, Bowie denied being asked those questions and providing those answers. When asked if he "want[ed] to be here today," he replied "no" and he acknowledged that he still had a pending case for his failure to appear.

¶ 50  On cross, Bowie testified that he had a pending contempt charge, that if he did not show up in court he could be locked up, and that the ASAs had asked for that warrant to issue. On the night of the shooting, when he first met with police, he told them that he was not even there when it happened. Between February 12, 2014, and April 2014, he did not speak with the police but he did speak with his brother Darrell Johnson and with Jarron George about what had happened. In April 2014, when he had a conversation with the police at his mother's house, he felt harassed by the police. Bowie explained what he meant by harrassed: "They kept continually coming. I kept telling them 'No,' and they put out warrants. I went out of town, I didn't want nothing to do with them ***, and they kept continuing." After being arrested in Wisconsin, Bowe was in jail

for seven days, being moved from place to place, from Sheboygan to Maywood and then to another location in Cook County.

¶ 51    Bowie testified that, on the night of the shooting, he and his friends possessed marijuana and they had gone to the convenience store looking for "papers" for the marijuana.  While they had not smoked marijuana that day, they had smoked "a lot" the night before.  Bowie smoked marijuana "basically" every day, although he had not smoked before his trial testimony.  When the white van first pulled up, Bowie did not even notice it, and his brother thought it was the police.  The entire incident happened very fast.  The shots happened immediately, and Bowie ran.  When he first heard the shots, he fell and then rose and ran back, the opposite way, toward the store.

¶ 52                    D. ASA Francisco Lamas

¶ 53    ASA Francisco Lamas testified that on the evening of March 27, 2014, he met at a police station with Darrell Johnson and his mother, who both consented to having Johnson's statement videotaped.  Detective Sipchen, ASA Lamas and Johnson then entered an interview room equipped for videotaping. Johnson's mother did not go into the interview room.  If Johnson's mother had wanted to attend, she would have been permitted in the room.  ASA Lamas has since viewed the resulting videotape, and it truly and accurately depicted the

interview. The videotape was then admitted into evidence without objection and portions were published to the jury.

¶ 54 On cross, ASA Lamas testified that Johnson was 13 years old when the video was made. Lamas testified that he told Johnson's mother that she could come into the interview room with them if she wanted, but he did not document why she did not. On redirect, Lamas testified that he had spoken with Johnson, with his mother present, about the offense, prior to the videotaping and that "[e]verything on the video we had already discussed with his mother in the room." On recross, Lamas testified that she was still at the police station when they finished videotaping.

¶ 55                                    E. ASA Paul Joyce

¶ 56 ASA Paul Joyce testified that on the evening of March 26, 2004, he met at a police station with Jarron George and spoke with George about a lineup that George had viewed earlier that day. George told ASA Joyce that he had identified "the shooter" from the lineup. With George's mother present, ASA Joyce asked if he would like to memorialize his statement but, because it was late, they wanted to go home and they agreed to return at a later date to memorialize it. ASA Joyce did not meet with George again.

¶ 57 ASA Joyce testified that, on April 13, 2014, he met at a police station with Keyshone Bowie who agreed to make a videotaped statement. Detective

Carr, ASA Joyce and Bowie entered an interview room equipped for videotaping. After the interview, ASA Joyce viewed the videotape, and it truly and accurately depicted the interview. The videotape was admitted into evidence without objection, and portions were published to the jury.

¶ 58    The parties stipulated that George was 15 years old at the time that ASA Joyce met with him. On cross, ASA Joyce recalled that Bowie told him that Bowie was 17 years old, but ASA Joyce did not recall if any family members were present with Bowie.

¶ 59                    F. ASA Robert Mack

¶ 60    ASA Robert Mack testified that, on May 5, 2014, he presented Jarron George to the grand jury. Prior to George's testimony, George and his mother arrived at ASA Mack's office where George's mother informed him that she did not want her son to testify. ASA Mack, Mack's supervisor, George and his mother appeared in front of a trial judge, and George and his mother told the judge that George was "in fear for his life." The court explained that, despite George's fear, he was required to testify and that, if he did not, he could be held in contempt of court. George chose to testify. Although George's mother was not allowed into the grand jury room, she waited for him on a bench outside the room. The transcript of George's testimony was then admitted into evidence

without objection, and the State published the portion of the transcript that is quoted above in ¶ 38.

¶ 61        ASA Mack also presented to the grand jury Darrell Johnson on May 8, 2014, and Keyshone Bowie on May 23, 2014. The transcripts were admitted into evidence without objection, and the State published the entire transcripts to the jury.   With respect to Bowie, ASA Mack explained that Bowie had previously been served with a grand jury subpoena for May 7, 2014, and failed to appear.   An arrest warrant was issued, and Bowie was located, arrested in Wisconsin and extradited to Illinois, arriving in custody to testify before the grand jury on May 23, 2014.   Prior to presenting Bowie to the grand jury, ASA Mack spoke with him.   No parent was present because Bowie was 17 years old.

¶ 62                    G. Firearm Evidence and Stipulations

¶ 63        Brian Smith, a forensic investigator with the Chicago Police Department, testified that he collected eight fired cartridge cases from the crime scene and took photographs of where they were found.

¶ 64        Kellen Hunter, a firearms examiner with the Illinois State Police, testified that, in connection with this case, he received eight fired 9-millimeter Luger cartridge cases and determined that they had all been fired from the same firearm.

¶ 65     The parties entered into a stipulation that, if Michael Savage were called to testify, he would testify that he is a fingerprint examiner with the Chicago police department and that he did not recover any prints suitable for comparison from the eight cartridge cases.

¶ 66     The parties further stipulated that, if Dr. Ponni Arunkumar were called to testify, she would testify that she is an assistant Cook County medical examiner; that the victim had gunshot wounds in his head, chest, abdomen, and buttocks; that he died from these multiple gunshot wounds; and that the wounds did not show evidence of close-range firing.

¶ 67                          H. Officer Robert Cummings

¶ 68     Officer Robert Cummings, with the Chicago Police Department, testified that, at 9:30 p.m. on February 11, 2014, the day before the shooting, he and his partner were on a routine patrol in an unmarked squad vehicle when they noticed a white Dodge Caravan double parked on South Honore Street, near 66th Street, which is a residential area in Chicago.  The van was parked in a way that obstructed the street.  Officer Cummings activated his vehicle's emergency lights and exited his vehicle to conduct a field interview with the van's occupants.  Prior to exiting, Officer Cummings also turned his vehicle's spotlights on the van. Officer Cummings approached the van's driver's side, while his partner, Officer Landrum, approached the passenger side.   The van

had three occupants. Defendant, whom Officer Cummings identified in court, was sitting in the front passenger seat, and Officer Cummings completed a contact card for him with information received from defendant that night. The contact card indicated defendant's full name, as well as his nickname, D-Rose. Officer Cummings identified a photo of the van and also testified that he had completed contact cards for the other two occupants, Clint Massey and Courtney Ealy.

¶ 69                                    I. Detective David Sipchen

¶ 70                                         1. Direct

¶ 71        Detective David Sipchen of the Chicago Police Department testified that, on the evening of February 12, 2014, he and his partner, Detective Minelli, arrived at the crime scene, and the area was already cordoned off with numerous other police officers present. The deceased victim was still lying on the ground. Detective Sipchen learned that there were three eyewitnesses, namely, Johnson, Bowie and George, but they were no longer on the scene. Detective Sipchen learned that other officers had interviewed them, and he received descriptions of the shooter, the van and the driver. The driver has not been arrested.

¶ 72        Detective Sipchen testified that, on February 13, 2014, the day after the shooting, he determined that there was a working video surveillance camera in

the area, and he contacted technicians who retrieved the video. While on the scene, he determined that the camera was a fixed camera, triggered by a motion sensor. Watching the video, he observed that it depicted some of what had transpired the night of the shooting. The video was admitted into evidence and published to the jury without objection. While the video shows individuals running from what is presumably the shooting, it does not depict the shooting itself.

¶ 73        Detective Sipchen testified that he interviewed Keyshone Bowie, Jarron George and Darrell Johnson with the video, and that they had identified themselves in it. As the video played, Detective Sipchen narrated, observing that the offender's vehicle appeared in the upper left corner and the victim disappeared left, off the screen. The video depicted Darrell Johnson running northbound in the street, and Keyshone Bowie by a mailbox and Jarron George just to the right of Bowie. Detective Sipchen testified that the video also showed the light from the van's headlights when the van first approached and then stopped.

¶ 74        Detective Sipchen testified that the street depicted in the video is a one-way street, allowing southbound traffic only. On February 13, 2014, Detective Sipchen received the name of a possible suspect, Jeremiah McCoy, and created a six-photo array. The following day, February 14, 2014, he went to Darrell

Johnson's home to show Johnson the array, but he was not home. Since the following testimony is at issue on appeal, we provide it below in full:

"Q. Was Darrell Johnson home?

A. He was not.

Q. Did you have the opportunity to speak to anyone at that time?

A. I did.

Q. And who was that?

A. His mother ***.

Q. Did you then leave the residence?

A. I did.

Q. And after you left the residence, what was the next thing that you did?

A. I went to the area. I created another photo array with an individual known as D-Rose.

Q. When you created that photo array with the nickname of D-Rose, did you learn the real name of D-Rose?

A. I did.

Q. What was that?

A. [Defendant.]

29

Q. Had you heard the nickname D-Rose prior to February 13th of 2014?

A. Prior to the 13th, no.

Q. Did you learn about the nickname D-Rose on the 13th?

A. I did.

Q. What information did you learn?

A. I had received an email[,] an intelligence report.

DEFENSE COUNSEL: Objection. Hearsay.

THE COURT: You're offering it for the course of the investigation [*sic*] over.

ASA: Exactly, Your Honor.

THE COURT: Overruled.

A. I had received an intelligence report from a 7th District sergeant regarding a traffic stop that occurred in the 7th District of a white minivan and D-Rose was an occupant of that vehicle.

DEFENSE COUNSEL: We will withdraw the objection."

¶ 75      Detective Sipchen testified that he learned that the occupants of the van during the February 11, 2014, stop were defendant, Clint Massey and Courtney Ealy; and that Clint Massey was arrested in a completely unrelated matter the

day after the shooting, February 13, 2014, while driving the van. When Massey was arrested, the white Dodge Caravan was impounded, and Detective Sipchen photographed it. He also confirmed that the impounded van was the same van from the February 11 traffic stop by comparing the vehicle identification numbers (VIN) on the contact cards for both incidents, and he observed that the windows were tinted.

¶ 76 Detective Sipchen testified that, on February 15, 2014, he created another photo array and went again to Darrell Johnson's home with photo arrays and photos of the van. Present at the home were Johnson, Johnson's mother, Jarron George and Keyshone Bowie. When Detective Sipchen showed them the photos of the white Dodge Caravan, they stated "that it looked the same as the white Dodge Caravan that they [had] seen the offender in." After Johnson and his mother each signed photo array advisory forms, Johnson viewed an array with defendant's photo but Johnson did not make an identification at that time. Detective Sipchen also showed Johnson a photo array with photos of Clint Massey, also known as Rondonumbanine, and Courtney Ealy, also known as C-Dai, but Detective Sipchen did not testify as to whether Johnson made an identification from the second array.

¶ 77 Detective Sipchen testified that, although George and Bowie were present, he did not show them the two photo arrays, because George was a

minor and a parent was not present; and at that time the police were under the belief that Bowie was on 62nd Street, west of Vernon Avenue, when the incident occurred.  The first photo array, which depicted defendant, also depicted an earlier suspect, Jeremiah McCoy, also known as Boss Smooth. However, McCoy was never identified as being in the van or in the vicinity of the shooting.

¶ 78    Detective Sipchen testified that, on March 19, 2014, he returned to Johnson's home and met again with Johnson with his mother present.   When Detective Sipchen asked Johnson if he knew "of local musical artist[s,] specifically D-Rose, C-[D]ai and Rondonumbanine," Johnson replied that D-Rose was the person who shot the victim.  Detective Sipchen showed Johnson another photo array, and Johnson identified defendant as the shooter by circling defendant's photo and initialing it.  Jeremiah McCoy, a.k.a. Boss Smooth, was also depicted in the array.   Johnson explained that he had not identified defendant earlier because Johnson feared for his life if anyone discovered he was cooperating with the police.  Johnson stated that he knew defendant from music videos and social media, which is also how he knew Rondonumbanine and C-Dai, but he did not observe the latter two in the van on February 12, 2014.

¶ 79        Detective Sipchen testified that, after defendant was arrested on March 26, 2014, he asked Darrell Johnson and Jarron George, with their mothers present, to view a lineup, from which they identified defendant. However, Detective Sipchen was not asked and did not state specifically that they identified defendant as the shooter. Johnson and George, with their mothers present, agreed to provide videotaped statements but due to the late hour they said that they would return. The next day, Johnson returned to make a videotaped statement, but George did not.

¶ 80        Detective Sipchen testified that Bowie was not asked to come in because his mother informed the police that he was in Wisconsin. On April 13, 2014, Detective Sipchen learned that Bowie was back in Chicago, and he visited Bowie at his home, with his mother present, and showed him a photo array. Detective Sipchen testified that Bowie identified defendant as the person whom Bowie observed "fatally shoot" the victim, and that Bowie circled defendant's photo and initialed the corner of the photo. Bowie explained that he had originally stated that he was not present because he feared for his life if others learned that he was cooperating with the police.

¶ 81        Detective Sipchen testified that, on April 25, 2014, he visited Jarron George at his home. George's grandmother was home, but not his mother, and the detective was denied permission to show George another photo array.

However, Keyshone Bowie was present, and Detective Sipchen showed him a photo array, but Bowie refused to sign the advisory form. When asked if he recognized anyone in the array, Bowie "pointed out with his finger Clint Massey and Courtney Ealy," but Bowie refused to initial the photos. Bowie stated that these two were *not* present in the white van on February 12, 2014, the night of the shooting.

¶ 82      After the State rested and the trial court denied defendant's motion for a directed finding, the defense read a stipulation. The parties stipulated that, if Detective Murphy was called to testify, he would testify that, on February 12, 2014, he interviewed Darrell Johnson who described the shooter as "a light skinned male black, 16 to 18, wearing a white cap, a white shirt and red pants." The defense rested.

¶ 83      During its closing, the defense reviewed the timeline of identifications. Initially, just hours after the shooting, the event witnesses did not identify defendant as the shooter. Counsel argued that, on February 15, 2014, "less than 72 hours" after the shooting, Johnson refused to pick defendant out of a photo array. Johnson first identified defendant "42 days after the shooting."

¶ 84      Responding to the defense's argument about "72 hours" and "42 days," the State made the following remarks in its rebuttal argument. Since these are the only closing remarks at issue on appeal, we quote them below in full:

"But let's go back, ladies and gentlemen. Not 42 days or 72 hours and whatever those numbers were. What did Detective Sipchen tell you[–] that on February 14th he already had the name D-Rose[,] so that's within 48 hours if you want numbers. He was given the name D-Rose and put it in a photo array. It wasn't until March 9th that Darrell [Johnson] had the confidence to then tell Detective Sipchen that's the guy who shot and killed my friend."

¶ 85    After listening to jury instructions, the jury began its deliberations at 3:30 p.m. and returned a verdict at 6 p.m., finding defendant guilty of first degree murder and of personally discharging the firearm that caused the victim's death.

¶ 86                        III. Conviction and Sentencing

¶ 87    On October 26, 2016, defendant filed a posttrial motion for a new trial. Whether or not certain issues were preserved for our review is an issue on appeal. Thus, we quote here the relevant portions of defendant's posttrial motion. The motion claimed, among other things, that:

"15. The Court erred in allowing, over defense counsel's objection, the State to ask Darrell Johnson whether he knew an individual by the name of Clint Massey. (9/13/16 Transcript, p[p]. 51-52.) Clint Massey is the well-known associate of Chief Keef who appears in Keef's rap music

videos. Chief Keef and his music videos have been linked to gang violence in Chicago. The question and testimony violated the Court's ruling prohibiting the State from referencing Chief Keef at trial and from using gang evidence at trial. Further, Clint Massey, along with Courtney Ealy ('C'Dai'), were convicted of First Degree Murder on March 11, 2016 in Cook County Criminal Court. During that trial, 'D-Rose' was named numerous times as an associate and possible suspect in the shooting. The shooting and trial were publicized, followed and commented on in local news media, social media and the internet, particularly in rap music and culture sites."

The motion did not provide cites to support its claim that the shooting and the trial were widely publicized.

¶ 88    Paragraphs 16 through 18 repeated the same claim, almost word for word, but with respect to the names of (1) Rondonumbanine, which is "the nickname for Clint Massey"; (2) Courtney Ealy; and (3) C-Dai, Courtney Ealy's nickname. Paragraphs 23 and 24 repeated the same claim, almost word for word, but with respect to the testimony of Keyshone Bowie concerning the names: (1) Rondonumbanine; and (2) C-Dai. Paragraph 37 claimed that "[i]t was improper for the State to ask Detective Sipchen what knowledge Darrell Johnson had of local musical artists, specifically D-Rose, C-dai and

36

Rondonumbanine," and then set forth the same arguments contained in the quote above.

¶ 89    On February 7, 2017, the trial court heard argument on the motion, and defendant argued, in relevant part: "we also contend that your rulings regarding gang evidence as well as the Chief Keef issues were also repeatedly violated through *** the repeated mention of Courtney Ealy, Clint Massey, DRose, RondoNumbaNine, Cdai."  In response, the State argued:

"In terms of the Chief Keef and the allegation that we violated the motion in limine, at no point whatsoever did the name Chief Keef come out.  The Court instructed the jury every day that they're not supposed to do any research on their own, any independent investigation.  So, unless they violated the court order, which is never—it's presumed that they follow the Judge's instruction, they know nothing about the relationship between Chief Keef, Clint Massey and Courtney Ealy, in terms of whether or not they were convicted of murder and their relationship to each other.

The reason that the names Clint Massey and Courtney Ealy were brought in is because they were eventually eliminated as suspects in this case. It was good, solid police work. *** Detective Sipchen testified that he presented various photo arrays, which included Clint Massey and

Courtney Ealy ***. And that, again, was to either eliminate them as suspects or determine that they were in fact involved ***."

¶ 90 With respect to this issue, the trial court found:

"So first let me start by suggesting that unless someone has a transcript that I have not seen, the name Chief Keef was never articulated in this courtroom during this trial. The name Chief Keef never came up."

The court did not refer to either Clint Massey or Courtney Ealy in its ruling, and proceeded to address other issues, denying defendant's posttrial motion for a new trial.

¶ 91 After hearing from witnesses in both aggravation and mitigation, and considering each of the statutory factors required for the sentencing of a juvenile offender, the court sentenced defendant to 40 years with IDOC. Prior to sentencing, the court observed that, if it sentenced defendant to 45 years, defendant would be "almost 58 years of age at the time of his release," and "that type of sentence would be inappropriate given his age." However, the court also found that "this crime was an outrage," and thus sentenced defendant to 40 years. Defendant immediately moved in court to reconsider the sentence, which was denied. On appeal, defendant raises no issues regarding either his sentence or sentencing.

¶ 92    On February 7, 2017, defendant filed a notice of appeal, and this timely appeal followed.

¶ 93                              ANALYSIS

¶ 94                    I. Names of Two Local Rappers

¶ 95    Defendant claims, first, that the trial court erred by overruling defense objections to the introduction of the names and nicknames of two local rappers who were convicted of murder several months prior to defendant's trial. The day before the shooting in the case at bar, the police had approached a white van because it was double-parked, and observed defendant in the van with these two men. Defendant argues that, although the shooting was also from a white van, the names of the van's other occupants on the prior day were irrelevant to the issues at trial and were prejudicial in light of their recent murder convictions.

¶ 96    The names and nicknames at issue were first introduced at trial during the testimony of the State's first event witness, Darrell Johnson. When he was asked if he knew Clint Massey, defense counsel objected, and a sidebar was held that was not transcribed. On the record, the trial court overruled the objection, and Johnson denied knowing anyone named Clint Massey. When the State asked if he knew anyone by the nickname Rondonumbanine, defense counsel stated: "Objection. Same reason." After the objection was overruled,

Johnson testified that he had heard the name from the internet and rap music. When the State asked if he knew a person named Courtney Ealy, defense counsel objected on the "[s]ame basis." The trial court again overruled it, and Johnson replied no. Johnson knew the nickname C-Dai, and, when asked how he knew it, defense counsel objected "for the same reasons [as] on the previous two questions." The trial court again overruled the objection, and Johnson explained that he knew that nickname from the "[i]nternet and songs."

¶ 97    Based on the above exchange, the State argues that the issue is forfeited and defendant argues that it is not. The State argues that the objection, when understood in the context of the whole trial, was a reference to defendant's pretrial motion seeking to bar any mention of Chief Keef or gangs, while defendant argues that he was objecting to the introduction of these two rappers, irrespective of Chief Keef or gangs, because of their recent murder convictions. The problem, of course, is that we will never know on what basis defense counsel objected, since the sidebar was not transcribed for the record.

¶ 98    However, even if the error was preserved, we cannot find that the trial court abused its discretion in balancing the probative value of the evidence against its possible prejudice, for the reasons explained below.

¶ 99    "Evidentiary rulings are within the sound discretion of the trial court, and will not be reversed unless the trial court abused that discretion." *People v.*

*Caffey*, 205 Ill. 2d 52, 89 (2001). "An abuse of discretion will be found only where the trial court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court." *Caffey*, 205 Ill. 2d at 89. When considering admissibility, "[t]he trial court must consider a number of circumstances that bear on that issue, including questions of reliability and prejudice." *Caffey*, 205 Ill. 2d at 89.

¶ 100 Relevant evidence is generally admissible. Ill. R. Evid. 402 (eff. Jan. 1, 2011). Our evidentiary rules define " '[r]elevant evidence' " as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Ill. R. Evid. 401 (eff. Jan. 1, 2011); *People v. Wheeler*, 126 Ill. 2d 92, 132 (2007) (a court must ask "whether that evidence is relevant in that it tends to make the question of guilt more or less probable"). Although relevant, evidence may still be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice." Ill. R. Evid. 403 (eff. Jan. 1, 2011); *People v. Blue*, 189 Ill. 2d 99, 125-26 (2000).

¶ 101 In the case at bar, the fact that defendant was in a white van the day before a shooting from a white van was relevant circumstantial information. Detective Sipchen testified that, on February 15, 2014, Darrell Johnson, Jarron George and Keyshone Bowie viewed photos of the white Dodge Caravan that

had been stopped on February 11, 2014, and that they stated "that it looked the same as the white Dodge Caravan that they [had] seen the offender in."

¶ 102    However, defendant was not alone in that van on February 11. Thus, by the same token that defendant's presence in the van was relevant, the State felt compelled to show that the presence of the other two individuals was *not* relevant. One method to do that was to establish that the event witnesses knew, and hence would recognize, these two other individuals, and that these individuals were not in the van at the time of the shooting. The way in which the event witnesses knew these individuals was by their names and nicknames. The names and nicknames were thereby relevant to the jury's ability to assess the strength and credibility of the witnesses' determination that these individuals were not present.

¶ 103    As this court has previously observed, this type of situation is "a situation where the State is confounded if it does not and confounded if it does." *People v. Henderson*, 2016 IL App (1st) 142259, ¶ 189. "If the State had failed to show that it had thoroughly investigated [the other two] before excluding them as suspects, then the defense would have argued that the State had failed to investigate two viable, alternative suspects." *Henderson*, 2016 IL App (1st) 142259, ¶ 189.

¶ 104    Defendant also argues that, even if relevant, their names and nicknames were unfairly prejudicial, primarily due to the unrelated and recent murder convictions.    Defendant's jury trial began on September 13, 2016, and concluded on September 15, 2016.  Defendant argues on appeal that Massey and Ealy were found guilty on March 11, 2016, approximately six months earlier.[4]  First, there is no evidence that any of the articles cited in defendant's appellate brief were cited to the trial court and, thus, they are not evidence of an abuse of discretion by the trial court.  Second, the connection could only have been possibly prejudicial if a juror had both heard of, and recalled the convictions from six months earlier. Even if we accepted defendant's contention that there were articles and publicity, we could not find the type of saturation that would preclude a fair trial, in the absence of evidence of juror knowledge.

¶ 105    In his reply brief, defendant argues that all the questions to the event witnesses about these two rappers could have been replaced with one question to Detective Sipchen, namely:  "Did you eventually rule out the two other people in the van on February 11, 2014, as possible suspects?"  However, a question like that could have raised a reasonable doubt in the minds of the jurors as to why the police were hiding from them any information about the

---

[4] Of the 11 online articles cited by defendant on appeal to show the publicity of the pair's trial, 7 are from March 2016, 3 are from May 2016 and 1 is from July 2016.

other two people in a white van, when a white van—and likely the same white van—was used, the very next day, in the fatal shooting at issue.

¶ 106 For the foregoing reasons, we cannot find that the trial court abused its discretion.

¶ 107 II. Inference from Conversation with Witness' Mother

¶ 108 Second, defendant claims that the State elicited testimony that a police detective spoke with the mother of an eyewitness, returned to the police station and generated a photo array with defendant, thereby creating the inference of an inadmissible out-of-court identification by the mother. Defendant claims that the State compounded this confrontation-clause error by arguing in closing that the detective was "given the name D-Rose and put it in a photo array."

¶ 109 Defendant admits that he did not preserve this alleged error for our review but asks us to review for plain error. Failure to either object to an error at trial or to raise the error in a posttrial motion results in forfeiture. *People v. Sebby*, 2017 IL 119445, ¶ 48. When a defendant has failed to preserve an error for review, we may still review the issue for plain error. *Sebby*, 2017 IL 119445, ¶ 48; Ill. S. Ct. R. 615(a) ("Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court."). The plain error doctrine allows a reviewing court to consider unpreserved error when (1) a clear or obvious error occurred and the evidence is

so closely balanced that the error also threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and the error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence. *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). In a plain error analysis, it is the defendant who bears the burden of persuasion. *Sebby*, 2017 IL 119445, ¶¶ 51-52.

¶ 110    Whether a defendant argues first- or second-prong error, "[t]he initial analytical step under either prong of the plain error doctrine is [to] determin[e] whether there was a clear or obvious error at trial." *Sebby*, 2017 IL 119445, ¶ 49; *Piatkowski*, 225 Ill. 2d at 565 ("the first step is to determine whether error occurred"). In addition, a reviewing court may affirm on any basis found in the record. *People v. Begay*, 2018 IL App (1st) 150446, ¶ 35.

¶ 111    In the case at bar, defendant's claimed confrontation-clause error rests on the assertion that the State elicited testimony of a hearsay identification by the mother. The confrontation clause of the sixth amendment to the United States (U.S. Const. amend. VI), made applicable to the states through the fourteenth amendment (U.S. Const. amend. XIV, *Pointer v. Texas*, 380 U.S. 400, 407-08 (1965)), guarantees the right of an accused in a criminal prosecution to "be confronted with the witnesses against him" (U.S. Const. amend. VI). The

landmark case of *Crawford v. Washington*, 541 U.S. 36 (2004), governs the constitutionality of admitting out-of-court statements at trial. *People v. Hood*, 2016 IL 118581, ¶ 20. Under *Crawford*, the confrontation clause prohibits the "admission of testimonial statements of a witness who did not appear at trial unless [the witness] was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Crawford v. Washington*, 541 U.S. 36, 53-54 (2004). See also *People v. Hood*, 2016 IL 118581, ¶ 20. "[W]hen the Supreme Court adopts a particular framework for applying a federal constitutional provision, we are required to follow that framework, regardless of how other courts, including this one, may have approached the issue in other decisions." *Hood*, 2016 IL 118581, ¶ 22.

¶ 112   Generally, we review *de novo* whether the admission of an out-of-court statement violated a defendant's constitutional right to confrontation. *People v. Beck*, 2019 IL App (1st) 161626, ¶ 22. However, since the trial court was not asked to and, thus, made no ruling below, we are by necessity reviewing the claimed error *de novo*. *De novo* review means that we perform the same analysis that the trial judge would have performed. *People v. Carlisle*, 2019 IL App (1st) 162259, ¶ 68.

¶ 113   Defendant, who bears the burden of persuasion, does not argue whether the statement is testimonial under *Crawford*. See *People v. Stechly*, 225 Ill. 2d

246, 267 (2007) ("statements to law enforcement officials are not *always* testimonial" (emphasis in original). However, before determining whether a statement is testimonial under *Crawford*, we must first determine whether a statement was, in fact, admitted.

¶ 114    In the case at bar, the detective did not testify about what Johnson's mother stated after he knocked on the door.  In addition, the mother herself was not an event witness, so the inference argued by defendant on appeal is that her son told her who the shooter was and she told the police.

¶ 115    Since *Crawford*, this court, as a general rule, has found that, where the context of a nontestifying witness' statement is not revealed, the mere fact that the jury could infer that something the nontestifying witness said caused the police to suspect the defendant does not necessarily mean that the defendant has the right to cross-examine the nontestifying witness. *People v. Henderson*, 2016 IL App (1st) 142259, ¶ 183.

¶ 116    As defendant argues, it would have been a reasonable inference, if the jury chose to draw it, that the mother referred to defendant on February 14, 2014.  However, it would also have been a reasonable inference that the mother stated that the shooter was not anyone in the detective's existing six-person photo array and he knew he had to start over—or that the mother did not provide any useful information and that, upon returning to the police station, the

detective evaluated the existing information that he had before him there and created another array. All of the above would have been reasonable inferences, particularly in light of the detective's testimony that he first obtained the name "D-Rose" from a report about a traffic stop of a white van the day before the shooting and the prominent role of a white van in the shooting. Without a direct question and answer on this topic, we cannot find what statement, if any, the jury "must" have taken away from this exchange.

¶ 117    This case is different from those cases cited by defendant in which officers testified that they interviewed an event witness and then were asked if, based on this information, they had someone they were "looking for." See *People v. Sample*, 326 Ill. App. 3d 914, 922 (2001); *People v. Armistead*, 322 Ill. App. 3d 1, 8 (2001). For example, in *People v. Sample*, 326 Ill. App. 3d 914 (2001), this court found error where a police detective testified that, after extensively interviewing two co-defendants at the police station, he was "looking for a third offender" by defendant's name. *Sample*, 326 Ill. App. 3d at 922, 924-25 ("the repetition of strong inferences that his co-defendants implicated defendant" was error, but harmless). Similarly, this court found error in *People v. Armistead*, 322 Ill. App. 3d 1 (2001), when a police detective testified yes to the question, "When you spoke to [the eyewitness] did you learn the identity of the shooter?" and then testified that, after this conversation, he

was "looking for" the defendant. In *Sample*, we found that, with respect to course-of-investigation testimony, "the testimony should be limited to the fact that there was a conversation without disclosing its content, and to what the police did after the conversation concluded," which was done in the case at bar. *Sample*, 326 Ill. App. 3d at 921.

¶ 118    The State's argument during closing that the detective "was given the name D-Rose and put it in a photo array" does not change our analysis, since the detective testified that he "was given the name D-Rose" in a police intelligence report, rather than from the mother or her son. In the line before, the State argued "on February 14th he *already had* the name D-Rose," (emphasis added) thereby noting that the detective already had the name prior to his February 14 conversation with the mother.

¶ 119    For the foregoing reasons, defendant has not sustained his burden of persuasion that a clear and obvious error occurred when the detective testified that he spoke with the mother, and next returned to the police station and created a photo array, particularly in light of the detective's testimony of how defendant did become a suspect.

¶ 120                              CONCLUSION

¶ 121    In sum, we are not persuaded by defendant's arguments on appeal and

affirm his conviction and sentence.

¶ 122       Affirmed.

¶ 123       JUSTICE LAMPKIN, specially concurring:

¶ 124       To be perfectly clear, I concur ONLY in the judgment.