# Illinois Official Reports

## Appellate Court

---

### *People v. Eubanks*, 2021 IL App (1st) 182549

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DERRICK EUBANKS, Defendant-Appellant. |
| District & No. | First District, Fourth Division<br>No. 1-18-2549 |
| Filed<br>Rehearing denied | June 30, 2021<br>July 22, 2021 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 15-CR-4629; the Hon. Erica L. Reddick, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | James E. Chadd, Douglas R. Hoff, Gavin J. Dow, and Stephanie T. Puente, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg and Matthew Connors, Assistant State's Attorneys, of counsel), for the People. |

PRESIDING JUSTICE GORDON delivered the judgment of the court, with opinion.
Justices Reyes and Martin concurred in the judgment and opinion.


## OPINION

¶ 1        Defendant Derrick Eubanks[1] was convicted, after a jury trial, of robbery and domestic battery and sentenced to 10 years with the Illinois Department of Corrections for the robbery and to a concurrent six-year sentence for the domestic battery.

¶ 2        On this direct appeal, defendant claims (1) that the evidence was insufficient, (2) that he was denied his right to a fair trial when the trial court denied his request to excuse a juror for cause, and (3) that the trial court's alleged failure to ensure that the jury accepted the presumption of innocence constituted plain error where the evidence was closely balanced.

¶ 3        For the following reasons, we do not find his claims persuasive and affirm.


¶ 4                                        BACKGROUND

¶ 5        At trial, the State's evidence established that defendant and Machelle Richards had been dating, that Richards tried to end the relationship but defendant still pursued and followed her, and that, on December 10, 2014, they had a physical struggle in her apartment that led to the current charges. Richards, a Chicago school teacher, testified that defendant choked her during the struggle so that she could barely breathe. At trial, defendant exercised his right not to testify. A friend of Richards testified about events both immediately before and immediately after the struggle in her apartment. However, only defendant and Richards were present in Richards's apartment during the struggle.

¶ 6        The State's case began with other-crimes evidence. The first witness called at trial was Yashica Green, a former girlfriend of defendant, who testified that defendant had also choked her.

¶ 7        Green testified that defendant was the father of her child. On February 9, 2006, she and defendant were dating. At 8:30 p.m., she pulled her vehicle in front of her apartment building, exited her vehicle, and began removing items from it. Defendant appeared from around a corner and approached, saying "Where the F you been?" Defendant pushed Green against the concrete wall of her apartment building, so that her back hit the building, and he started strangling her. Defendant placed his hands around her neck, choking her, while claiming that she had cheated on him. Green testified that a police vehicle suddenly pulled up and two Chicago police detectives exited their vehicle and "stopped" defendant. Defendant "kept trying to come at" Green, and the detectives "kept pushing him back." When the detectives asked Green "if everything was okay," Green responded that she wanted defendant to leave her alone. While the detectives spoke with defendant, Green entered her building, retrieved some items from her apartment, returned to her vehicle, and drove to her sister's house. When she exited

_____

[1]In his brief to this court, defendant alleges that his first name was misspelled in the trial court and that it should be spelled "Darrick." Since all the relevant court documents bear the spelling "Derrick," we use this spelling as well, for consistency's sake.

her building to enter her vehicle, the detectives were still outside with defendant, and Green declined their request to come to the police station. After the attack, Green had scratches on her neck and marks on her back.

¶ 8 Leon Burch, age 50, testified that he had known Machelle Richards, the victim in the instant case, for 20 years. Burch and Richards had previously worked together when he was a security guard at a Chicago public school. On December 10, 2014, Richards picked Burch up between 8 and 9 a.m. and gave him a ride to a doctor's appointment and then to a meat market. During the ride to the market, Richards received phone calls, and after they exited the market, Burch observed defendant walking up to Richards's vehicle. Burch testified that he identified defendant "vaguely" since Burch had observed him only twice before.

¶ 9 Burch testified that, as he and Richards were sitting in the front seat of her vehicle, defendant entered the back seat. Defendant remained there for 5 to 10 minutes while Richards asked defendant multiple times to leave. Burch recalled defendant saying "F*** the police" at some point during their argument. Richards and defendant were "[a]rguing back and forth," with their voices "raised, at points." After Richards informed defendant that she needed to return to Burch's home so that Burch could pick up his children from school, defendant exited her vehicle. As Richards was driving back to Burch's home, Burch observed defendant following in his vehicle, all the way back to Burch's home. After Richards dropped Burch at his home and drove away, Burch observed defendant continuing to follow her.

¶ 10 Since defendant claims on appeal that no rational juror could have found the victim's testimony credible, we provide her testimony in detail below.

¶ 11 Machelle Richards, age 42, testified that she had been a Chicago public school teacher for 13 years. Richards lived in Chicago all her life and had known defendant since childhood. Richards and defendant dated "[o]n and off" for a year, with the relationship ending on November 22, 2014, when she filed a police report regarding his wrongful conduct. After filing the report, Richards stopped answering defendant's phone calls and cut off communication with him.

¶ 12 Richards testified that, on October 9, 2014, at 4 p.m., she and defendant met at 17th Street and Harrison Avenue in order to talk. The conversation became heated, and she tried to walk away. Defendant grabbed her arm, and she threw some orange juice, which she had in a plastic container, in his face. In response, defendant hit her in the face with an open palm, causing a cut on her nose. After Richards entered her vehicle, defendant opened the trunk of her vehicle and began throwing its contents over a high security gate that was nearby. The contents included new books for the school year starting in January that she had just received. Defendant fled in his vehicle while Richards was on her cellphone with the police. Richards subsequently filed a police report, but she did not pursue it because "[i]t was embarrassing. I'm a teacher I just wanted to *** go my separate way."

¶ 13 Richards testified that defendant continued to contact her through phone calls and text messages, although she had stated that she wanted no further communication. Richards did respond to "[s]ome of them." On December 10, 2014, at 6 a.m., she was at home getting ready for work when she received more than 10 phone calls from defendant. Richards answered one of the calls because, the day before, defendant had sent her a text message depicting himself standing outside of her building and she wanted to make sure the area was "clear." Richards agreed to meet defendant in Hyde Park later that day to talk, although she had no intention of doing it.

¶ 14 Richards testified that, later that day, she drove her friend, Leon Burch, to a doctor's appointment and then to a meat market. While they were at the meat market, she received text messages from defendant, asking where she was, since she had agreed to meet him in Hyde Park; she told him at that point that she was at the meat market with Burch. Richards testified that, after she and Burch exited the market and entered her vehicle, defendant "came out from out of nowhere" and sat in the back seat of her vehicle. Richards was "just stunned." Defendant asked her why she was lying, and she asked him repeatedly to exit her vehicle. When he remained in the vehicle, she exited and walked in back of her vehicle, saying that she had to go to work and Burch had to pick up his children. Defendant opened the door and put one leg out but did not exit. Richards observed police officers near the meat market and asked, "do I have to flag a police car down? Can you just get out of the car?" Defendant responded that he did not "give an F about the police."

¶ 15 Richards testified that she did not flag down an officer because she felt safe with Burch present. Richards returned to the driver's seat. When Burch asked defendant to exit because he had to pick up his kids, defendant exited the vehicle. As Richards was driving toward Burch's house, she observed in her rearview mirror that defendant was following her. Richards raised her middle finger out the window toward him. Defendant followed Richards to Burch's house. After dropping off Burch, Richards drove to the school where she worked and found defendant already there. He approached her vehicle, saying he wanted to talk, and entered her vehicle, sitting in her front passenger seat. Defendant wanted to know how they could work things out, and she told him there was no way. When defendant refused to exit, Richards exited her vehicle and walked toward the school. Defendant began "using language saying what the F," but Richards kept walking. After entering the building, she told the security guard that someone was threatening her in the parking lot. However, when Richards and the security guard turned to the security camera, they realized that defendant's vehicle was no longer present.

¶ 16 Richards worked her shift[2] and punched out. An hour before her shift ended, she texted defendant, asking him to leave her alone. Defendant texted back that he would meet her at her home. An hour later, when she left work, she called her neighbor, "Uncle Cliff,"[3] to let him know that she had been followed all day and to look out for her and that she would be home soon. Cliff lived with Tiffany DeBack on the first floor of the same building where Richards lived on the second floor. When Richards arrived home, she did not observe defendant. However, she sat in her vehicle and called Cliff; he exited the building to meet her. As they were entering the building, Richards told Cliff she was going to spray a solution in the common area of the building because her dog had pooped that morning on the carpet. Since the solution required ventilation, Richards opened the front door before starting to spray.

¶ 17 As Richards was on the stairs spraying the solution, defendant entered the front door saying, "Why are you so evil? You didn't see me calling you." Richards started backing up the stairs, with defendant following her. Richards turned and ran to her apartment while screaming Cliff's name. Defendant pushed Richards into her apartment and locked the door behind them. When Richards asked defendant what he wanted, he went on his knees "in a praying position,"

---

[2] On cross-examination, Richards clarified that on December 10, she was working "in administrative," rather than as a teacher.

[3] Tiffany DeBack later testified at trial that "Cliff" was her father-in-law, Clifton Arnold. However, since the victim referred to him only as "Cliff" or "Uncle Cliff," we use that name as well.

and she ran to the door, but he blocked it. While standing by the door, he started crying and saying he was going to leave, and she said, "Thank you." But, instead of leaving, he went into her bedroom, and she followed him, saying "I thought you was about to leave." He replied, no, that he was going to watch television, and he picked up the remote. Richards snatched the remote from him, saying "No, the F you're not," and that is when defendant grabbed her by the neck with one hand. His thumb and index finger were open and around her neck, with the rest of his hand pressed against her throat.

¶ 18 Defendant pushed Richards on the bed by her neck, so that she was lying on the bed on her back. Defendant hovered over her, on top of her, with one leg on either side of her body, and choked her, with one hand around her neck. Richards testified that she started "fighting him, scratching, whatever [she] could do." As she fought, his grip tightened and she could not breathe. Richards "saw [her] life flash before her eyes." Since defendant is tall and since he did not have his body pressed against her, it was hard for her to reach him to scratch. At one point, when she was trying to reach up to scratch him, he bit her right middle finger. Eventually, she went limp and stopped fighting. Defendant removed his hand, and she was gasping for breath. She kept repeating that she could not breathe, and he stood up. After a few minutes, she stood up, holding the wall and stumbling to her bedroom door, where she collapsed and urinated on herself. Defendant picked her up off the floor and was holding her against the wall, while Richards repeated that she could not breathe and asked for water. Defendant permitted her to walk to the kitchen, where she grabbed her cell phone and rushed into the living room. Defendant was right behind her, so she stuffed her hand with the phone under her sofa cushions. Defendant was on top of her, and they tussled over the phone, while she was on her knees, in front of the sofa. Defendant twisted her wrist and gained the phone. Fearing for her life, Richards ran into the kitchen and grabbed a knife. Defendant told her that if she stabbed him, he would stab her, so she dropped the knife. While saying that he did not want to fight, defendant shook Richards by her arms. Richards tried to fight back, begging him to let her go. Instead, defendant smacked her with an open hand on the right side of her face, she fell to the floor, and he dropped the cell phone. After he dropped the phone, she dived for it, and they began tussling over it again. During the fight, the phone "[s]omehow" dialed her voicemail, a fact that she did not realize until later.

¶ 19 At some point, Richards ripped defendant's vest and he let her go, and she ran out the back door and down the stairs, screaming "Uncle Cliff." Cliff and DeBack's apartment door opened and she ran inside, saying "Call the police. Call the police." While Richards was in the kitchen telling them what had happened, they heard "a lot of crashing" coming from upstairs in Richards's computer room, as though things were being broken. DeBack's kitchen is connected to Cliff's bedroom, and Richards's computer room is right above his bedroom. Then they heard defendant running down the stairs, and DeBack opened her door and said "I'm calling the police." Defendant replied, "B***, I don't care." Richards asked DeBack to go with her to retrieve Richards's phone because, otherwise, "at a touch of a button he has my bank account." DeBack and Richards exited through the side of the house and walked to the front, where Richards observed defendant in his vehicle parked in front of the building. Richards opened the back door of defendant's vehicle, while defendant was in the driver's seat, to try to prevent him from leaving with her cell phone. Defendant started driving his vehicle forward and back and "totaled" a neighbor's vehicle that was parked in back of defendant's vehicle.

Defendant backed his vehicle into the neighbor's vehicle twice, striking the front of the neighbor's vehicle.

¶ 20 Richards testified that the police arrived 10 seconds after defendant drove off. The next day, Richards went to a courthouse to press charges and obtain a restraining order. Richards identified a photo taken on December 10, 2014, as a photo of her middle finger on her right hand showing torn skin and two photos taken the day before trial of the same finger showing scarring. Richards identified a photo also taken on December 10, 2014, of her computer room after defendant left, which she testified shows that her desktop computer was missing and that her printer was broken. Richards testified that her computer had been in her apartment prior to the struggle. Richards testified that the photo depicted "an extra PC" laying sideways on the floor, which she testified was previously on top of her computer desk. In court, Richards identified an exhibit as the shirt she wore on December 10, and it was ripped, and she testified that it was not ripped prior to defendant's assault. Richards also identified an exhibit as defendant's vest which she had found in her backyard on December 10 after defendant left. Both exhibits were admitted into evidence.

¶ 21 On cross-examination, Richards clarified that defendant had stolen two computers from her: her laptop computer on November 22, 2014, and her desktop computer on December 10, 2014. Richards admitted that, on December 10, 2014, she did not observe a computer in defendant's hands or in his vehicle and that she did not visit a doctor after the offense. She weighed 220 pounds at the time of the offense and is five feet and three inches tall. Richards had a friend, China Robinson, who worked at a phone company and, who, at Richards request, retrieved the voicemail from Richards's phone that had inadvertently made an audio recording of part of the incident.

¶ 22 Detective David Scarriot testified that he had worked for the Chicago Police Department for 20 years. On December 30, 2014, he met with Richards at a police station, where she showed him an injury to her finger. Scarriot also met with Robinson and recorded a voicemail from Robinson's phone onto a compact disc, which was admitted into evidence. In addition to Richards's case, Scarriot was assigned a case in which defendant claimed to have been the victim in the same incident at issue. On December 10, 2014, at 6 p.m., which was an hour and a half after the police had been called to Richards's home, defendant went to a police station about 20 miles away from the incident to report that he had been the victim of domestic violence. Scarriot did not speak with defendant until December 19, 2014, when defendant informed the detective that he already had a court date regarding the incident that he intended to attend.

¶ 23 The State recalled Richards, who testified that her voicemail had inadvertently made an audio recording of the struggle in the kitchen between herself and defendant, that she had listened to both the original recording and a subsequent recording of it by Robinson, that the original recording was a true and accurate recording of the struggle in the kitchen, and that the subsequent recording by Robinson was a true and accurate recording of the original voicemail. The trial court admitted the audio recording for the limited purpose of corroborating the witness's testimony that a recording had been made,[4] and the recording was played for the

---

[4]Later, when the jury asked during its deliberations to listen to the recording, the trial court observed that "it was admitted for a limited purpose. So my concern is *** having them engage in the exercise

jury. At the start, a mechanical voice states that the message was recorded at 4:33 p.m. The recording is not clear but one can hear clearly the high-pitched voice of a woman in distress, crying and screaming. Richards identified the female voice as hers.

¶ 24    Tiffany DeBack, age 35, testified that Richards was her neighbor for over five years, when they lived in a two-flat building. Richards lived upstairs, and DeBack lived downstairs with several people, including her father-in-law, Clifton Arnold. At 5:30 p.m. on December 10, DeBack had just arrived home after working a 12-hour factory shift and turned on the television. DeBack heard a muffled yell, which she thought was Richards's dog. When the noise continued for five minutes, DeBack opened the front door to determine if someone was hurting the dog, but she observed the dog was okay. DeBack was heading toward the back door, when she heard Richards say, " 'Uncle Cliff, call the police.' " Since DeBack had her phone in her hand, she called the police and yelled upstairs, " 'I'm calling the police.' " In response, she heard defendant say, " 'B***, f*** the police,' " and DeBack locked her door. Then Richards and defendant came down the stairs, with Richards smelling like urine and looking scared. Richards was crying, her face was swollen, and she looked like she was in shock. DeBack testified that she knew Richards had urinated on herself because DeBack smelled it and Richards's shoes were "going squeak, squeak."

¶ 25    DeBack testified that, when they were inside DeBack's apartment, they heard "boom, boom," which sounded like a car accident and which she discovered later was the sound of defendant's vehicle striking their neighbor's vehicle. DeBack and Richards exited the building, went around the back and then to the front, where they observed defendant in his vehicle driving his vehicle backward and hitting the vehicle parked behind him, so that his vehicle "pushed her whole hood all the way in." Defendant drove forward and back, hitting the neighbor's vehicle a second time. As defendant drove away, the police arrived. Defendant's vehicle was only two blocks away when the police arrived.

¶ 26    On cross-examination, DeBack testified that, when she arrived home from work and entered the front door, Richards was by the front door, cleaning where her dog had pooped that morning. When DeBack observed defendant exiting the building, he was "carrying something under his arm."

¶ 27    After DeBack's testimony, the State rested, and the trial court denied defendant's motion for a directed finding.

¶ 28    The defense recalled DeBack as its first witness. DeBack testified that she did not recall whether she told Detective Scarriot that defendant had something in his hands, but she did recall that defendant had something in his hands. When DeBack and Richards were in front of the building after the incident, Richards was "yelling, 'He got my phone and my computer.' " DeBack explained: "the only reason she was following him was because he had her phone and her computer." On December 30, 2014, Richards testified in court at a hearing for a protective order. After reading a transcript of the hearing, she confirmed that she had not testified at that time to observing something in defendant's hands. On cross-examination, she explained that the hearing was solely about "domestic violence." At the hearing, she testified that she observed defendant run down the stairs after she said she was going to call the police, that defendant stated " 'F*** the police,' " and that he hit the neighbor's vehicle.

_____

of trying to decipher the content of what's being said in the video as opposed to *** hearing the audio for the limited purpose of corroborating her claim that it captured [a] portion of the event."

¶ 29     Officer Loretta Wiechert testified that, on December 10, 2014, she was on patrol with her partner in a marked squad vehicle and in uniform, when they responded to a call at 4:40 p.m. about a battery in progress and arrived at Richards's building at 4:50 p.m. When Wiechert arrived, she did not observe any vehicles speeding away. Wiechert, who made a police report, did not notice or smell urine when speaking with Richards. When Wiechert informed Richards that Wiechert would like an evidence technician to come to the scene, Richards replied that Richards could not stay and wait for an evidence technician at that time.

¶ 30     On cross examination, Weichert testified that Richards appeared "visibly upset, distraught, shaken." Richards "appeared disheveled" and was "not communicating very well" and was "trying to clean up." After entering Richards's apartment with Richards, Weichert observed that the apartment was "in disarray," with items out of place, "just like there had been some sort of incident." Weichert completed a case report concerning the battery and an accident report concerning a damaged vehicle that Weichert observed and that defendant had reportedly struck. On redirect, Weichert testified that she did not call for an ambulance.

¶ 31     Officer Peter Masheimer testified that, on December 10, 2014, he was working at a desk, in order to assist citizens who came in from the street seeking police assistance. Officer Masheimer recalled speaking to a man at 6 p.m. with defendant's name, but the officer could not identify defendant in court. While defendant was in the process of reporting a domestic violence incident, Officer Masheimer observed that defendant's sweatshirt was torn at the neckline and that defendant had superficial lacerations or scratches to his chest. After completing a report, Officer Masheimer referred the case to the domestic violence unit. On cross examination, the officer noted that he offered medical assistance, which defendant declined. Officer Masheimer informed defendant how he could obtain an order of protection and how he could seek a warrant for the arrest of the offender.

¶ 32     After listening to closing arguments and jury instructions, the jurors retired to deliberate. About an hour later, they sent out a note asking to listen again to the audio recording. After receipt of the note, the trial court stated:

>      "[The court's] concern is misuse of this evidence. They're going to spend undue time trying to play it and play it back to decipher what's being said when it is not introduced into evidence for that purpose, it's solely introduced to corroborate [the victim's] claims that a portion of this event was captured by this *** voicemail message."

Before sending the audio recording back to the jury, the trial court provided the following response and limiting instruction:

>      "Yes, you may listen to the audio recording again. You're further instructed that this audio recording was introduced into evidence for the limited purpose of establishing whether a portion of the incident was captured by voicemail. This audio recording evidence should not be considered by you for any other purpose."

¶ 33     The jury continued its deliberations for over an hour and reached a verdict, finding defendant guilty of robbery and domestic battery but not guilty of home invasion and aggravated domestic battery.

¶ 34     On September 19, 2018, the trial court denied defendant's posttrial motion for a new trial. On October 2, 2018, the trial court sentenced defendant as a Class X offender to 10 years for robbery, to be served concurrently to a 6-year sentence for domestic battery. On October 31, 2018, defendant placed a *pro se* notice of appeal in institutional mail, which was filed by the

trial court on November 7, 2018. On November 16, 2018, the trial court issued a written order finding that the notice had been timely filed and appointing the State Appellate Defender. This appeal followed.

¶ 35                                     ANALYSIS
¶ 36                          I. Sufficiency of the Evidence

¶ 37    Defendant's first claim is that the evidence against him was insufficient to convict him of the charges because Richards's testimony was allegedly contradicted and uncorroborated.

¶ 38    When an appellate court is asked to consider the sufficiency of the evidence after a trial, our function is not to retry the defendant. *People v. Beauchamp*, 241 Ill. 2d 1, 8 (2011). Instead, we determine whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Beauchamp*, 241 Ill. 2d at 8. In this determination, we draw all reasonable inferences from the record in favor of the State. *Beauchamp*, 241 Ill. 2d at 8. A reviewing court will not reverse a conviction unless the evidence is so improbable, unsatisfactory, or inconclusive that it creates a reasonable doubt of the defendant's guilt. *Beauchamp*, 241 Ill. 2d at 8. Also, a conviction may generally be sustained on circumstantial evidence alone. *Beauchamp*, 241 Ill. 2d at 9.

¶ 39    Our supreme court has "consistently held that the testimony of a single witness is sufficient to sustain a conviction if the testimony is positive and credible, even if it is contradicted by the defendant." *People v. Harris*, 2018 IL 121932, ¶ 27. It is the trier of fact, not the reviewing court, that is "responsible for resolving conflicts in the testimony, weighing the evidence, and drawing reasonable inferences from the facts." *Harris*, 2018 IL 121932, ¶ 26.

¶ 40    In the case at bar, defendant was found guilty of count IV, robbery, "in that he, knowingly took property, to wit: a mobile phone and a computer, from the person or presence of Machelle Richards, by the use of force or by threatening the imminent use of force." See 720 ILCS 5/18-1(a) (West 2018).

¶ 41    Defendant was also found guilty of count VIII, domestic battery, "in that, he knowingly, without legal justification, by any means caused bodily harm to Machelle Richards, to wit: grabbed and struck Machelle Richards about the body, and Machelle Richards was a family or household member, to wit: Machelle Richards and [defendant] have had a dating relationship." See 720 ILCS 5/12-3.2(a)(1) (West 2018).

¶ 42    First, defendant argues that the fact that the jury convicted him of the above two counts but acquitted him of home invasion and aggravated domestic battery must mean that the jury did not believe Richards's testimony that defendant entered her home against her will or that he strangled her. However, these two facts are not needed for the offenses that he was convicted of.

¶ 43    Second, defendant argues that the fact that DeBack did not hear Richards screaming "Uncle Cliff" when Richards and defendant entered Richards's apartment must mean that Richards was not, in fact, screaming for Uncle Cliff at the start of the encounter and that, therefore, defendant did not enter against her will. However, DeBack testified that, even after she had turned on the television, she still heard a sound of distress, which she attributed to the dog and which caused her to exit her apartment to investigate. In addition, unauthorized entry was not a fact needed for either of the two counts of which defendant was convicted.

¶ 44   Third, defendant argues that Richards's testimony of a near-death strangulation was improbable. However, as noted above, this fact was not necessary for the counts of which defendant was convicted. In his brief to the court, defendant acknowledges that the above factual weaknesses that he argues do not "amount to a failure of proof on robbery and domestic battery."

¶ 45   Fourth, defendant argues that there was "little to no evidence of bodily harm," which is a fact needed for domestic battery. See 720 ILCS 5/12-3.2(a)(1) (West 2018). However, Richards testified to an injury to her finger, and photos were admitted that showed torn skin at the time of the offense, as well as present-day scarring. In addition, Richards testified to being struck, shaken, and generally beaten by defendant.

¶ 46   Fifth, defendant argues that Richards's testimony that defendant took property from her during the incident was unsubstantiated. Although there was no requirement for Richards's testimony to be substantiated, it—in fact—was substantiated. DeBack testified that defendant had something in his hands when he exited Richards's building. In addition, DeBack testified that, when she and Richards were standing in front of their building after the incident, Richards was "yelling, 'He got my phone and my computer.' " In his brief to this court, defendant suggests other types of evidence that the State could have obtained to confirm whether defendant had taken Richards's cell phone and laptop, such as cell phone site location data. However, the State was under no obligation to obtain additional evidence. During closing arguments, defense counsel argued this point to the jury—that the police could have done more to confirm the location of Richards's stolen phone. Counsel argued: "Are you saying that the Chicago Police Department doesn't have the ability to say oh, wait, your phone was stolen, hold on, we have [a way] to find that phone. *** [Y]ou can say, let me make a call, I'll let you know where it is." Again, counsel argued: "Nobody since then has ever contacted the phone company to say let's put [sic] the location of this phone. Has it been tried [sic] to restart it? Nobody does that." It was up to the jury, as factfinder, to weigh the persuasiveness of this argument.

¶ 47   Sixth, defendant argues on appeal that Richards and DeBack disagreed about whether defendant or Richards came down the stairs first after the struggle. Richards testified that she came down first. On appeal, defendant argues that DeBack testified that, by the time DeBack observed Richards, defendant had already fled the building. However, DeBack's testimony is not as clear on this point as defendant claims. DeBack testified, first, that defendant "came down and [Richards] was coming down," without specifying who came down first. Next, DeBack testified that she and Richards were "standing there for a long time waiting on the police." In response to the question, "as you were standing there with [Richards], did you see [defendant][?]," DeBack responded no, he had already exited the building by that point. Possibly realizing the lack of clarity in DeBack's testimony about the order in which defendant and Richards descended the stairs, defense counsel made the strategic choice not to argue the point in his closing argument. An appeal is not the place to raise for the first time a point that was fully known but strategically rejected by trial counsel as not significant enough to argue.

¶ 48   Seventh, defendant argues that, although Richards testified that she urinated on herself during the struggle and DeBack smelled it, the responding police officer testified that she did not smell it. On appeal, defendant argues that this point demonstrates the insufficiency of the State's evidence. However, this insufficiency was already argued and decided at trial. In defendant's closing argument at trial, counsel argued that the responding officer "[d]oesn't

notice any urination" in order to support his argument that Richards did not suffer a near-death strangulation as she had claimed. The indictment accused defendant, of among other things, aggravated domestic battery, in that defendant "strangled" Richards. However, the jury carefully listened to and weighed the evidence and acquitted defendant of this charge. Thus, to the extent that there was an alleged insufficiency in the evidence, the jury's verdict reflected it.

¶ 49    In the case at bar, although only the victim and defendant were present during the struggle, the victim's testimony was corroborated before, during, and after the struggle. It was corroborated before by Burch, whose testimony indicated that defendant was following and pursuing the victim earlier that same day. It was corroborated during by the voicemail message which captured the sounds of a woman crying and screaming in distress. It was corroborated after by DeBack, who observed the victim's physical state, as well as something under defendant's arm, and by the responding officer, who observed both the victim's physical state and that the apartment appeared in "disarray." In addition, the jurors heard other-crimes evidence, which the trial court instructed them they could consider "on the issue of the defendant's propensity to commit domestic violence." Green's testimony corroborated the testimony of the victim in this case, in that defendant had the propensity to become violent in a dating relationship where he thought his status in the relationship was threatened.

¶ 50    For all the foregoing reasons, we cannot find the evidence insufficient, and we do not find defendant's arguments persuasive.

## II. Jury Selection

¶ 51

¶ 52    In defendant's opening brief, defendant argued that the trial court denied him a fair trial when it denied his motion to strike a particular juror for cause. In response, the State argued that this issue was waived by trial counsel's decision not to exercise a remaining peremptory challenge against this juror. In addition, the State observed that defendant had not argued that trial counsel was ineffective for making this choice. In his reply brief, defendant withdrew this argument, and thus, we do not consider it.

## III. Venire Question

¶ 53

¶ 54    Lastly, defendant argues on appeal that the trial court failed to ensure that potential jurors accepted the presumption of innocence and that this error amounted to plain error because the evidence was closely balanced.

¶ 55    Illinois Supreme Court Rule 431(b) (eff. July 1, 2012) provides that the trial "court shall ask each potential juror, individually or in a group, whether that juror understands and accepts" certain fundamental principles. The first, and most important, principle is "that the defendant is presumed innocent of the charge(s) against him or her." Ill. S. Ct. R. 431(b) (eff. July 1, 2012). The rule does not set forth a particular litany that the trial court must recite, but Rule 431(b) does require that "[t]he court's method of inquiry shall provide each juror an opportunity to respond to specific questions concerning the principles set out in this section." Ill. S. Ct. R. 431(b) (eff. July 1, 2012).

¶ 56    The question of whether a trial court complied with Rule 431(b) is a question that a reviewing court considers *de novo. People v. Wilmington*, 2013 IL 112938, ¶ 26. *De novo*

consideration means that a reviewing court performs the same analysis that a trial judge would perform. *People v. Aljohani*, 2021 IL App (1st) 190692, ¶ 37.

¶ 57 Defendant concedes that he forfeited this claim by not raising it in the court below, but he asks us to consider it pursuant to the plain error doctrine. When a claim has been forfeited, the plain error doctrine permits us to still review it if a clear and obvious error occurred and either (1) the evidence is so closely balanced that this error alone threatened to tip the scales of justice against the defendant or (2) the error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence. *People v. Sebby*, 2017 IL 119445, ¶ 48. Defendant argues error under solely the first or closely-balanced prong of the plain error doctrine. See *Sebby*, 2017 IL 119445, ¶ 52 ("A Rule 431(b) violation is not cognizable under the second prong of the plain error doctrine, absent evidence that the violation produced a biased jury."). "The initial analytical step under either prong of the plain error doctrine is determining whether there was a clear or obvious error at trial." *Sebby*, 2017 IL 119445, ¶ 49.

¶ 58 Defendant also concedes that the trial court questioned potential jurors about whether they *understood* the presumption of innocence. However, he claims that the trial court failed to ask whether they *accepted* it. Specifically, defendant argues that "while" the trial court "gave jurors the opportunity to raise their hands if they did not understand the presumption of innocence, that was not enough."

¶ 59 During jury selection, the trial court told potential jurors that it was about to explain certain legal principles and that it would then pose two questions to them. The court stated that the first question would be "whether there's any among you who does not understand that legal principle, and if you don't understand it, you're required to raise your hand." Next, the court stated that "the second question will be whether there is any among you who does not accept the principle of law. So if you do not accept the principle of law that I will announce, I'll need you to raise your hand."

¶ 60 For three of the four principles, after discussing the principle, the trial court asked the jurors (1) to raise their hand if they did not understand it and, then, (2) to raise their hand if they did not accept it. However, for the first principle, the trial court inadvertently omitted (2) and, thus, failed to ask them to raise their hand if they did not accept it.[5]

¶ 61 We provide below the trial court's introductory remarks and the questions posed regarding the first and second principles. The trial court's questions and comments regarding the second principle are included for comparison's sake. The trial court stated:

"I'm going to start with explaining some legal principles to you. I will have two questions for you after explaining the simple legal proposition. The question will be first whether there's any among you who does not understand that legal principle, and if you don't understand it, you're required to raise your hand. And then the second question will be whether there is any among you who does not accept the principle of law. So if you do not accept the principle of law that I will announce, I'll need you to raise your hand.

_____

[5]We know this omission was inadvertent because the trial court posed this same question the following day when discussing these principles with the potential jurors who were being considered as alternate jurors.

We'll start with the first legal proposition. The defendant, Mr. Derrick Eubanks, is presumed innocent of all the charges against him. Is there anyone who does not understand this principle of law, that any person accused of a crime is [p]resumed innocent. If you do not understand this principle of law, indicate by raising your hand.

No hands were raised.

Second, before [defendant] can be convicted the State must prove him guilty beyond a reasonable doubt. Is there anyone who does not understand this principle of law, that the person accused must be proved guilty beyond a reasonable doubt. If you do not understand the principle, indicate by raising your hand.

No hands are raised.

If there's any among you who does not accept this principle of law, indicate by raising your hand.

No hands were raised."

The trial court then proceeded to properly admonish the potential jurors about the remaining principles.

¶ 62      After over 100 pages of questioning of the potential jurors by the trial court, the court asked the parties if they had any additional questions. Defense counsel then had the following exchange with one of the potential jurors:

"[DEFENSE COUNSEL]: Let me ask you this. Right now there's a presumption that my client is innocent as the judge has told you, correct?

[POTENTIAL JUROR]: Correct.

[DEFENSE COUNSEL]: And you heard no evidence, correct?

[POTENTIAL JUROR]: Correct.

[DEFENSE COUNSEL]: And you went back to the jury room, it could only be one verdict, right?

[POTENTIAL JUROR]: Correct.

[DEFENSE COUNSEL]: And what would that verdict be?

[POTENTIAL JUROR]: For me at this second, unfortunately it would be guilty without knowing anything else.

[DEFENSE COUNSEL]: Hearing no evidence?

[POTENTIAL JUROR]: Unfortunately, yes.

[DEFENSE COUNSEL]: And he has the presumption that he's innocent sitting there.

[POTENTIAL JUROR]: Yes.

[DEFENSE COUNSEL]: So you know that goes against everything that the judge has just told you?

[POTENTIAL JUROR]: Right, because you're innocent until proven guilty.

[DEFENSE COUNSEL]: So under that theory if you're innocent until proven guilty and they have to come to beyond a reasonable doubt and you heard no evidence, the only proper verdict you really know would be not guilty, right?

[POTENTIAL JUROR]: I mean in theory. It's going to be very difficult for me to go back and be separated, shall we say, from my history."

¶ 63    During a subsequent sidebar, the State agreed that this juror should be struck for cause. When the parties returned to open court, defense counsel posed the following question to the entire venire:

> "Now, I ask the other jurors as a group understanding what we know, that there's a presumption of innocence and there's no evidence, does anyone have a problem with if they went back right now that there's only one verdict and that would be not guilty: Does anyone have a problem with that issue?"

The transcript reflects that defense counsel then stated: "Other than you, sir." The potential juror who had already been struck replied: "Sorry." Their exchange indicates that no other juror came forward. Questioning of potential jurors then continued for another 20 pages.

¶ 64    In *Sebby*, instead of asking the jurors whether they understood and accepted the four principles, the trial court asked potential jurors whether they " 'had any problems with' " or " 'believed in' " those principles. *Sebby*, 2017 IL 119445, ¶ 49. Reviewing this language, our supreme court found "[t]hat was a clear error" for purposes of the plain error doctrine. In the case at bar, the remarks of defense counsel, quoted above, echo the remarks of the *Sebby* trial court, in that they both ask whether the potential jurors had any problem with the principle in question. Thus, counsel's remarks did not remedy the problem.

¶ 65    The State argues that the court in the instant case did *instruct* the potential jurors that they had to both understand and accept all four principles. While true, the trial court did not *ask* potential jurors whether they accepted the presumption of innocence. In the exchange above, the potential juror indicated that he understood the presumption but he did not accept it. Our supreme court has found that a trial court complies with Rule 431(b) if it: "(1) instructs the prospective jurors on the four principles, (2) asks if the prospective jurors understand those principles, and (3) asks if the prospective jurors accept those principles." *People v. Birge*, 2021 IL 125644, ¶ 34. In the case at bar, the trial court did (1) and (2) with respect to the presumption of innocence but overlooked (3).

¶ 66    In *People v. Thompson*, 238 Ill. 2d 598, 607 (2010), our supreme court found that Rule 431(b) mandates a "question and response process." The rule "requires an opportunity for a response" from each potential juror on both their understanding and acceptance of these principles. *Thompson*, 238 Ill. 2d at 607. In the case at bar, the trial court failed to give potential jurors the opportunity to respond concerning their acceptance of the presumption of innocence. Faced with similar circumstances, our supreme court found:

> "[W]hile the trial court asked the prospective jurors if they understood the presumption of innocence, the court did not ask whether they accepted the principle. The rule requires questioning on whether the potential jurors both understand and accept each of the enumerated principles. Therefore, we necessarily conclude that the trial court violated Rule 431(b)." *Thompson*, 238 Ill. 2d at 607.

Thus, pursuant to *Sebby*, *Birge*, and *Thompson*, we must find that a clear and obvious error occurred.

¶ 67    Although we find a clear and obvious error occurred, we cannot find plain error where defendant has failed to show that the evidence in the case at bar was closely balanced. See *Sebby*, 2017 IL 119445, ¶ 48. While a defendant has no burden at trial to present any evidence at all, a defendant does bear the burden on review when claiming plain error "to show that the evidence is closely balanced." *People v. Piatkowski*, 225 Ill. 2d 551, 567 (2007); see also

*Sebby*, 2017 IL 119445, ¶ 51. To satisfy his burden, defendant argues on appeal, first, that the jury's conviction on some charges and acquittal on others shows that the evidence was closely balanced. However, one could also find that it shows that the jury carefully considered and weighed the evidence before it.

¶ 68    In the section above, we considered defendant's arguments attacking the sufficiency of the evidence, and we will not repeat them again here. Defendant argues that the evidence against him was not closely balanced because (1) with respect to the robbery, there was no evidence corroborating the victim's testimony that he stole her cell phone and computer, and (2) with respect to the domestic battery, the evidence corroborating her testimony of an injury to her finger was weak and there was no evidence corroborating her claims of other bodily harm.

¶ 69    First, there was evidence corroborating the victim's testimony that defendant stole her cell phone and computer. On cross-examination, DeBack testified that, when she observed defendant exit the building, he was "carrying something under his arm." Later, the defense recalled DeBack in its case-in-chief, and she testified that, when she and Richards were in front of their building after the incident, Richards was "yelling, 'He got my phone and my computer.' " DeBack further testified that "the only reason [Richards] was following him was because he had her phone and her computer." DeBack acknowledged that, when she testified in court at a hearing for a protective order, she had not testified at that time to observing something in defendant's hands. However, on cross-examination during the defense's case-in-chief, she explained that hearing was solely about "domestic violence." Thus, contrary to the defendant's argument on appeal, there was evidence corroborating the victim's testimony that defendant stole her cell phone and computer.

¶ 70    Second, the State was not required to prove a lasting physical injury to sustain a conviction for domestic battery. The statute requires "bodily harm" not permanent injury. 720 ILCS 5/12-3.2(a)(1) (West 2018). A person is guilty of domestic battery if he or she causes bodily harm, "by any means," to a family or household member. 720 ILCS 5/12-3.2(a)(1) (West 2018). " 'Family or household members' include *** persons who have or have had a dating or engagement relationship." 720 ILCS 5/12-0.1 (West 2018).

¶ 71    The jury acquitted defendant of aggravated domestic battery but found him guilty of ordinary domestic battery. Our supreme court has historically defined ordinary battery, as opposed to aggravated battery, as "some sort of physical pain or damage." *People v. Mays*, 91 Ill. 2d 251, 256 (1982); see also *People v. Cisneros*, 2013 IL App (3d) 110851, ¶ 15 (citing *Mays*). In the case at bar, defendant was found guilty of count VIII, domestic battery, which charged that he "grabbed and struck Machelle Richards about the body." See 720 ILCS 5/12-3.2(a)(1) (West 2018). Contrary to defendant's argument, there was evidence, in addition to Richards's testimony, to support the jury's finding that defendant grabbed and struck her.

¶ 72    DeBack testified that Richards's face was swollen, that she was shaking, and that she looked like she was "in shock." The responding police officer testified that Richards was "visibly upset, distraught, shaken" and that Richards "appeared disheveled and was kind of not communicating very well and trying to clean up." The officer testified that, when she entered Richards's apartment, she noticed that "things were in disarray." The officer explained that, by " 'disarray,' " she meant "[i]tems were out of place *** just like there had been some sort of incident." The officer testified that she had "responded to a battery in progress call." In addition to the testimony of DeBack and the responding officer, the audiotape also corroborated Richards's testimony that she was the victim of a violent altercation. While the recording is

not clear, one can still hear the high-pitched voice of a woman in distress, crying and screaming. Lastly, there was the other-crimes evidence showing defendant's propensity to commit domestic violence. Thus, contrary to defendant's argument, there was evidence corroborating the victim's testimony that she was grabbed and struck by defendant.

¶ 73 Defendant argues that this case is similar to *Piatkowski*, 225 Ill. 2d at 554, which involved weak identification evidence. In *Piatkowski*, the issue was "whether an erroneous jury instruction about eyewitness identification testimony rose to the level of plain error so as to require a new trial." *Piatkowski*, 225 Ill. 2d at 554. Utilizing the five *Biggers* factors which are commonly used to assess eyewitness identification testimony (see *Neil v. Biggers*, 409 U.S.188 (1972)), our supreme court found that the identifications were weak, and thus, the error rose to the level of plain error. *Piatkowski*, 225 Ill. 2d at 567-68. The instant case bears no resemblance to *Piatkowski*. In the case at bar, there was no issue about identity. Defendant conceded in his opening statement that he went to talk to the victim.

¶ 74 As we already discussed above, the victim's testimony was corroborated before, during, and after the struggle. Burch testified that defendant was following and pursuing the victim earlier that same day. The voicemail message captured the event itself, including the sounds of a woman crying and screaming in distress. Afterwards, DeBack observed the victim's physical state, as well as something under defendant's arm, and the responding officer observed both the victim's physical state and that her apartment appeared in "disarray." The jury also heard other-crimes evidence establishing defendant's propensity to commit domestic violence when he believed his status in the relationship was threatened.

¶ 75 For the foregoing reasons, we find that defendant has not satisfied his burden on review to show that his case was closely balanced.

¶ 76 CONCLUSION

¶ 77 In conclusion, for all the reasons discussed above, we cannot find defendant's arguments persuasive, and we affirm his conviction and sentence.

¶ 78 Affirmed.