2022 IL App (1st) 192509
No. 1-19-2509
Opinion filed March 9, 2022

THIRD DIVISION

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 16 CR 18865 |
| JAVION HARRIS, | ) ) | The Honorable Maura Slattery Boyle, and |
| Defendant-Appellant. | ) | Stuart P. Katz, Judges, presiding. |

PRESIDING JUSTICE GORDON delivered the judgment of the court, with opinion.
Justices McBride and Justice Ellis concurred in the judgment and opinion.

**OPINION**

¶ 1        After a jury trial, defendant Javion Harris was convicted of the first degree murder of Yvonne Nelson and the attempted murder of James Clark. Defendant, who was 15 years old at the time of the offense, was sentenced to 29 years for the murder and 6 years for the attempted murder, for a total of 35 years with the Illinois Department of Corrections. The convictions stemmed from a shooting on May 20, 2016, shortly before 4 p.m., on South State Street in Chicago, in which the shooter was shooting at Clark while Nelson, a bystander, had just exited a nearby Starbucks.

¶ 2        On this direct appeal, defendant claims (1) that the juvenile court erred in transferring his case to adult criminal court, (2) that the trial court committed plain error where the evidence in the case was closely balanced and the court failed to comply with Illinois Supreme Court Rule 431(b) (eff. July 1, 2012), and (3) that the trial court erred in admitting certain hearsay statements under the course-of-investigation exception to the hearsay rule. The State concedes that the trial court failed to comply with Rule 431(b) but argues that the evidence in the case was not closely balanced and the claimed error was forfeited.

¶ 3        For the following reasons, we affirm.

¶ 4                                    BACKGROUND

¶ 5        The State's evidence at trial established that, on May 20, 2016, at 3:53 p.m., a shooter opened fire on South State Street. Clark testified that the shooter was shooting at him. Although wounded, Clark survived, but Nelson, a bystander, did not. Nelson died shortly after the shooting from a single gunshot wound to the chest.

¶ 6        Videos obtained from street surveillance cameras recorded the shooting, as well as the shooter's flight from the scene. Video footage established that the shooter wore a black hooded sweatshirt and entered a nearby apartment building less than a minute after the shooting. Teon Spencer,[1] a resident of the apartment building, testified that defendant was a friend of his and visited Teon that afternoon. The police later retrieved a black hooded sweatshirt from Teon's bedroom and submitted it for forensic testing. The tests revealed that the cuffs of the sweatshirt contained gunshot residue and that the inside collar contained DNA that matched defendant's DNA. Although the cuffs, collar, and front pocket of the sweatshirt contained DNA mixtures

_____

[1]Teon's mother was also mentioned at trial. Since they share the same last name, we refer to Teon by his first name.

belonging to at least three to five individuals, only one major profile was suitable for comparison, and it belonged to defendant.

¶ 7        Teon testified that he and defendant subsequently exited Teon's building, and video footage depicted Teon and defendant exiting the building at 5 p.m., with defendant wearing a blue hooded sweatshirt. Teon identified defendant as the person in the blue hooded sweatshirt who exited with him.

¶ 8        Earlier footage established that Teon had entered the building at 3:48 p.m., shortly before the shooting and did not exit until after it.

¶ 9        Teon testified that he did not place the black hooded sweatshirt on his bed. Teon unlocked the apartment door to let defendant inside after defendant knocked and then Teon immediately went downstairs to talk to his mother. As a result, Teon did not observe defendant until Teon subsequently entered his bedroom, where defendant was already waiting. Teon never observed defendant wearing a black hooded sweatshirt that day and never observed defendant changing clothes. However, according to Teon's testimony, defendant was initially alone in Teon's bedroom for 5 or 10 minutes while Teon spoke with his mother.

¶ 10       Clark, the subject of the shooting, could not identify the shooter. Video footage showed that the shooter had the hood of his sweatshirt pulled tightly over his head and that the hood formed a large, odd shape, indicating a lot of hair underneath. The video that depicted defendant and Teon exiting the apartment building also showed defendant with a hood drawn tight, forming a similar odd shape.

¶ 11       Using still photographs obtained from the video footage, detectives showed images of the shooter to individuals familiar with defendant. The head of security at defendant's school recognized the shooter as a student who had the nickname of "Lenny Kravitz," due to his "afro"

hairstyle. When the head of security asked the dean of students to pull up a picture of "Lenny Kravitz," the dean provided defendant's school photo. Unlike the head of security, the dean was unsure whether the photo of the shooter was a photo of defendant. Defendant's physics teacher, who had defendant in class daily, could not identify the photo of the shooter as a photo of defendant.

¶ 12     Prior to trial, Daniel Mitchell provided a recorded statement in which he stated that he ran a taxi service, that he transported defendant to 35th Place near South State Street, that defendant paid his fare and began running toward State Street, and that Mitchell then heard gunshots but did not observe the shooting. Mitchell identified an image of the shooter taken prior to the shooting as defendant. However, when shown an image of the shooter taken after the shooting, Mitchell stated that he was "not a hundred percent sure" whether it was a photo of defendant. At trial, Mitchell testified that he could not recall the day of the shooting or recall providing a recorded statement. Over defendant's objection, the recorded statement was admitted as substantive evidence at trial and published to the jury.

¶ 13     After considering the evidence, the parties' arguments and the jury instructions, the jury found defendant guilty of first degree murder and attempted murder. The trial court denied his posttrial motion for a new trial, and defendant was sentenced on June 20, 2019, to a total of 35 years. The trial court denied his motion to reconsider sentence on November 7, 2019, and a notice of appeal was filed the same day. This timely appeal followed.

¶ 14                                          ANALYSIS

¶ 15                              I. Transfer to Adult Court

¶ 16     Defendant's first claim is that the juvenile court erred by transferring his case to adult criminal court. In Illinois, a minor who is 13 years old or older may be prosecuted as an adult

under the laws of this state (1) if the State files a transfer motion and (2) if the juvenile court "finds that there is probable cause to believe that the allegations in the [State's] motion are true and that it is not in the best interests of the public to proceed under" the Juvenile Court Act of 1987 (Act) (705 ILCS 405/5-805(3)(a) (West 2016)).

¶ 17                                    A. Standard of Review

¶ 18            While defendant concedes that reviewing courts normally review a juvenile court's transfer decision only for an abuse of discretion, he argues that a *de novo* standard should apply to this particular case because all the evidence at the transfer hearing was in the form of exhibits and proffers. Since there were no live witnesses at the transfer hearing, defendant argues that this court is in the same position as the juvenile court was and, therefore, this court should owe no deference to the juvenile court. *People v. Anderson*, 2021 IL App (1st) 200040, ¶ 41 (under *de novo* review, "we owe no deference to the trial court").

¶ 19            *De novo* review means that the reviewing court performs the same analysis that a trial judge would perform and owes no deference to the trial court. *Anderson*, 2021 IL App (1st) 200040, ¶¶ 40-41. In contrast, an abuse of discretion is found only where the trial court's ruling is arbitrary, fanciful, unreasonable or where no person would take the view adopted by the trial court. *People v. Khan*, 2021 IL App (1st) 190679, ¶ 55.

¶ 20            In response, the State argues that the title of the statutory provision at issue is "[d]iscretionary." 705 ILCS 405/5-805(3) (West 2016). Defendant was transferred to adult criminal court pursuant to the "[d]iscretionary transfer" provision. 705 ILCS 405/5-805(3) (West 2016). This section provides that, if the juvenile court finds (1) probable cause to believe the State's allegations and (2) that a juvenile proceeding is not in the public's best interest, "the court *may* enter an order permitting prosecution" in adult criminal court. (Emphasis added.)

705 ILCS 405/5-805(3)(a) (West 2016). "Except in very unusual circumstances affecting the public interest, the legislature's use of the word 'may' indicates that the statute is permissive as opposed to mandatory." *Canel v. Topinka*, 212 Ill. 2d 311, 326 (2004).

¶ 21 With statutory construction, our primary goal is to ascertain the legislators' intent, and the best indication of that intent is the plain and ordinary meaning of the words they chose to use. *Sekura v. Krishna Schaumburg Tan, Inc.*, 2018 IL App (1st) 180175, ¶ 40. In light of the legislature's use of the words "[d]iscretionary" and "may," as well as our precedent on this subject, we find that the decision to transfer under this provision is a matter of judicial discretion. 705 ILCS 405/5-805(3) (West 2016); *e.g.*, *People v. Moore*, 2011 IL App (3d) 090993, ¶ 29 (transfer reversed where the juvenile "court's transfer order was an abuse of discretion"); *People v. Clark*, 119 Ill. 2d 1, 14 (1987) (transfer reversed due to an abuse of discretion). We observe that defendant does not cite a single case where a reviewing court applied *de novo* review to a transfer under the discretionary transfer provision.

¶ 22 While "[t]he decision to permit prosecution of a juvenile under the criminal law is a matter of judicial discretion, *** that discretion is limited and controlled by the Act." *Moore*, 2011 IL App (3d) 090993, ¶ 21; see also *People v. Morgan*, 197 Ill. 2d 404, 422-23 (2001). "To affirm an order transferring a minor to criminal court," a reviewing "court must determine if there was sufficient evidence in the record as to each statutory factor to support the transfer order." *Moore*, 2011 IL App (3d) 090993, ¶ 21 (citing *Morgan*, 197 Ill. 2d at 428). "The mere recitation" by the juvenile court "that all statutory factors have been considered is not enough to affirm a discretionary transfer order." *Moore*, 2011 IL App (3d) 090993, ¶ 21 (citing *Clark*, 119 Ill. 2d at 18). However, "in reviewing a juvenile court's order transferring a minor," a reviewing "court does not reweigh the factors." *Morgan*, 197 Ill. 2d at 428.

¶ 23                              B. Statutory Factors

¶ 24         To determine whether a discretionary transfer is warranted, a juvenile court must

consider the following statutory factors:

"(i) the age of the minor;

(ii) the history of the minor, including:

    (A) any previous delinquent or criminal history of the minor,

    (B) any previous abuse or neglect history of the minor, and

    (C) any mental health, physical, or educational history of the minor or combination

of these factors;

(iii) the circumstances of the offense, including:

    (A) the seriousness of the offense,

    (B) whether the minor is charged through accountability,

    (C) whether there is evidence the offense was committed in an aggressive and

premeditated manner,

    (D) whether there is evidence the offense caused serious bodily harm,

    (E) whether there is evidence the minor possessed a deadly weapon;

(iv) the advantages of treatment within the juvenile justice system including whether

there are facilities or programs, or both, particularly available in the juvenile system;

(v) whether the security of the public requires sentencing under Chapter V of the

Unified Code of Corrections:

    (A) the minor's history of services, including the minor's willingness to participate

meaningfully in available services;

(B) whether there is a reasonable likelihood that the minor can be rehabilitated before the expiration of the juvenile court's jurisdiction;

(C) the adequacy of the punishment or services." 705 ILCS 405/5-805(3)(b) (West 2016).

¶ 25                                    C. Balancing the Factors

¶ 26         The statute further provides that, in balancing the above factors, the juvenile "court *shall* give greater weight to the seriousness of the alleged offense, [and] the minor's prior record of delinquency than to the other factors listed in this subsection." (Emphasis added.) 705 ILCS 405/5-805(3)(b) (West 2016).

¶ 27         Citing the 1987 case of *Clark* and cases citing *Clark*, defendant argues that the juvenile court must balance the best interests of the juvenile against society's interest in being protected. *Clark*, 119 Ill. 2d at 12. However, the *Clark* court was interpreting an earlier version of the statute that stated just that. The earlier statute required the juvenile court to determine " 'whether the best interest of the minor and the security of the public' " required a transfer. (Emphasis omitted.) *Clark*, 119 Ill. 2d at 8 (quoting Ill. Rev. Stat. 1983, ch. 37, ¶ 702-7(3)).

¶ 28         Since the 1987 *Clark* case, the legislature enacted the balancing provision quoted above. 705 ILCS 405/5-805(3)(b) (West 2016); see *In re Rodney H.*, 223 Ill. 2d 510, 518-19 (2006) (the legislature's "retool[ing] Article V of the Act" in 1999 marked a fundamental shift toward the overriding goal of protecting the public); *People v. Fiveash*, 2015 IL 117669, ¶ 21. "The legislature created the juvenile court and defined its authority. No other right to adjudication in juvenile court exists." *Fiveash*, 2015 IL 117669, ¶ 21. The power to define the limits of the juvenile court's jurisdiction rests with the legislature, and the legislature is entitled to define, and redefine, the applicability of the statute. *Fiveash*, 2015 IL 117669, ¶ 31. "[N]o

8

constitutional right to juvenile court proceedings exists." *Fiveash*, 2015 IL 117669, ¶ 31. Given the legislature's power to define and redefine juvenile jurisdiction, we apply the balancing provision as written.

¶ 29        The balancing provision quoted above took effect on January 1, 1999, and was in effect on the day of the trial court's transfer decision on December 2, 2016, and is still in effect today. See 705 ILCS 405/5-805(3)(b) (West 1998); 705 ILCS 405/5-805(3)(b) (West 2016). Both a trial court and a reviewing court must apply "the provisions of the Act in effect at the time of [the defendant's] transfer." *Morgan*, 197 Ill. 2d at 423.

¶ 30        The legislators who passed the balancing provision also provided a "Legislative Declaration," in which they expressed their intent as follows:

> "The General Assembly finds that a substantial and disproportionate amount of serious crime is committed by a relatively small number of juvenile offenders. *** [I]n all proceedings under [the transfer section] *** the community's right to be protected shall be the most important purpose of the proceedings." 705 ILCS 405/5-801 (West 2016).

¶ 31                    D. Mental Health

¶ 32        The finding primarily disputed by defendant on appeal is the juvenile court's finding regarding his mental health history. 705 ILCS 405/5-805(3)(b) (West 2016) (the "court shall consider *** any mental health *** history of the minor"). "In a transfer hearing under the Act, the State need only present evidence sufficient to sustain a finding of probable cause." *Morgan*, 197 Ill. 2d at 426.

¶ 33        At defendant's transfer hearing, held on Monday, November 28, 2016, the trial court received exhibits and proffers from both sides and heard argument. Defendant's exhibits

included the report at issue on appeal, which is a 30-page report prepared at defense counsel's request by Phyllis Gould, a licensed clinical social worker.

¶ 34    In her report, Gould stated that she first met defendant on August 25, 2016, while he was being held at a juvenile detention center for this offense. Gould met with defendant a total of five times between August and October 2016 and spoke on the phone with family members. Gould also met in person with two of his teachers at the detention center and reviewed his present and past school and juvenile records. Over half of her 30-page report details the conversations that she had with defendant and others.

¶ 35    Gould administered 7 different diagnostic tests to defendant but then disagreed with the results of almost all the tests she had administered. Gould administered (1) the Beck Depression Inventory (BDI), (2) the Beck Anxiety Inventory (BAI), (3) the Drug Abuse Screening Test (DSAT-10), (4) Short Michigan Alcohol Screening Test (SMAST), (5) the Screen for Child Anxiety Related Disorders (SCARED), (6) the ADHD Symptom Checklist—Child and Adolescent Version, and (7) the Child PTSD Symptom Scale (CPSS). The only result that Gould did not disagree with was the result of the DSAT-10, which revealed that defendant had "a moderate level problem with drugs (marijuana)."

¶ 36    Although the BDI and BAI showed that defendant's depression and anxiety were "mild," Gould found these results not credible. Similarly, Gould found the SMAST result "not accurate" and stated that she "disagree[d] with his scores on SCARED, as well as his scores on the ADHD and CPSS tests. All of these results, including those she disagreed with, were from tests that Gould had administered herself.

¶ 37    Gould diagnosed defendant with five disorders: (1) chronic post-traumatic stress disorder, (2) attention deficit disorder without hyperactivity, (3) adolescent-onset conduct

disorder, (4) dissociative amnesia, (5) and cannabis dependency which was presently in remission due to his controlled environment. There is no evidence that defendant had been diagnosed with any of these disorders by anyone else at any time. At the transfer hearing, defense counsel argued that these disorders "were previously missed" by others.

¶ 38   At the transfer hearing the State proffered the following facts regarding Gould that the court admitted without defense objection. Gould charged $150 per hour and billed 65.5 hours on this case, for a total of $9,825. Her caseload consisted of private psychotherapy clients, court evaluations in divorce and immigration proceedings, and sentencing mitigation reports. In criminal proceedings, Gould had never worked on behalf of the prosecution; she worked exclusively on behalf of the defense. She had worked with only one prior juvenile offender, and she had never previously evaluated a juvenile defendant for possible transfer to adult criminal court.

¶ 39   With respect to Gould's report, the trial court observed that she provided details from both her own interviews and tests, as well as from her reviews of "reports from Chicago Public School, Chicago Police Department, and all juvenile court documents." After reviewing all the facts compiled in Gould's report, the trial court found:

>   "In her interviews with [*sic*] family and friends she found little to no indication of mental health issues beyond anger management at school. There were no reports from anyone of any symptoms of PTSD, of attention deficit disorder, of conduct disorder. The mother noted, at most, that he was not his usual self after the deaths of several family and friends which might indicate to some slight degree post-traumatic stress disorder. But that's the total extent of any reporting from *anybody* in his background of any kind of mental health issue.

11

There were no mental health diagnoses from any other professional prior to Ms. Gould, nothing from any doctor, nothing from the Chicago Public Schools. There were no prior hospitalizations. There were no prior hospitalizations. There was no prior mental health treatment, no reports of any systems of mental health. In fact, the teachers at the JTDC *** report that he has no behavioral problems, no issues in their classes, which runs counter to her diagnoses of any attention deficit disorder, depressed or conduct disorder.

In fact, there's no indication anywhere of any mental health issues. She tested him herself for depression and anxiety. The test scores came back in the mild to normal range. She presented tests called the DAST and SMAST, and came up with moderate cannabis abuse. She also did tests that are called SCARE, S-C-A-R-E-D, and ADHD and child PTSD tests all scored within the mild to normal range.

Despite all of the evidence to the contrary, including her own testing, she still finds that he suffers from the five DSM-5 diagnoses and she bases this solely on her own observations and determinations that he was in denial and demonstrated emotional detachment. And she apparently ignores or disavows all historical evidence and all testing data in order to come to her conclusions." (Emphasis in original.)

Where the facts relied on by the juvenile court for its findings are taken primarily from the expert's own report, and where the expert's own diagnoses are contrary to the results of almost all the tests that she chose to administer and that she administered herself, we cannot find that the juvenile court abused its discretion in not accepting the defense's argument that their expert had found what everyone else had "missed."

¶ 40    Defendant argues that his lack of any prior mental diagnoses is not dispositive of whether or not he has mental health issues. However, his lack of prior diagnoses is relevant to whether or not he has a mental health "history," which is what the statute required the juvenile court to consider. 705 ILCS 405/5-805(3)(b)(ii)(C) (West 2016). The statute requires the juvenile court to consider "(ii) the history of the minor, including: *** (C) any mental health *** history." 705 ILCS 405/5-805(3)(b)(ii)(C) (West 2016).

¶ 41    For all the foregoing reasons, we cannot find that the juvenile court abused its discretion in evaluating defendant's mental health history.

¶ 42                                E. Other Factors

¶ 43    Defendant acknowledges that the statute requires the juvenile court to place the most weight on the seriousness of the offense and defendant's prior record, and we find that the juvenile court did just that. 705 ILCS 405/5-805(3)(b) (West 2016) (in balancing the statutory factors, the juvenile "court shall give greater weight to the seriousness of the alleged offense, [and] the minor's prior record of delinquency than to the other factors listed in this subsection").

¶ 44    At the transfer hearing, the defense counsel conceded that the statutory factors concerning the offense "apply to him"—the offense was serious, and he was charged as a principal and with using a deadly weapon and causing great bodily harm. 705 ILCS 405/5-805(3)(b)(iii) (West 2016). Other than to argue that defendant should receive a presumption of innocence, the defense did not dispute that the State had established probable cause for the allegations of the charged offense. 705 ILCS 405/5-805(3)(a) (West 2016).

¶ 45    The juvenile court rejected the State's argument that the offense was premediated, finding instead that the shooting was "a spur-of-the-moment type of offense." However, the

juvenile court found that the offense was "seriously aggressive," where defendant "chase[d] down an apparent target and sho[t] at him several times." See 705 ILCS 405/5-805(3)(b)(iii) (West 2016).

¶ 46     Defendant had two prior findings of delinquency for two separate armed robberies committed on the same day, for which he received a single term of probation. The robberies occurred when he was 14 years old. After receiving a five-year term of probation on June 23, 2015, he committed the instant offense less than a year later. On May 20, 2016, the day of this offense, defendant was 25 days short of his sixteenth birthday, when he would have been subject to the automatic transfer statute. At the transfer hearing, defense counsel conceded, as was clear from this case, that defendant was "not successful on probation."

¶ 47     The juvenile court acknowledged that defendant "does do well in a structured penal setting as evidenced by his exemplary discipline records at the [juvenile detention center] and the reports of his teachers there." The court found "[t]hat factor" regarding the advantages of treatment within the juvenile justice system "goes to the Defense." See 705 ILCS 405/5-805(3)(b)(iv) (West 2016). Similarly, in its brief to this court, the State acknowledged that the factor of "rehabilitative potential favors defendant."

¶ 48     However, there were no DCFS findings of abuse or neglect, no record of a learning disability, and no evidence that defendant was ever placed in special education.

¶ 49     Given this record and the legislative imperative to "give greater weight" to the seriousness of the offense and the minor's prior criminal history, we cannot find that the trial court abused its discretion in balancing the statutory factors. 705 ILCS 405/5-805(3)(b) (West 2016); see also 705 ILCS 405/5-801 (West 2016) ("in all proceedings under [the transfer section] *** the community's right to be protected shall be the most important purpose of the

proceedings).' "[I]n reviewing a juvenile court's order transferring a minor," a reviewing "court does not reweigh the factors." *Morgan*, 197 Ill. 2d at 428. Since we find that the trial court did not abuse its discretion in balancing the statutory factors, we need not address defendant's argument to remand the matter to the trial court for a hearing pursuant to *People v. Fort*, 2017 IL 118966, ¶ 41.[2] See 705 ILCS 405/5-130(1)(c)(ii) (West 2018).

¶ 50                        II. Failure to Comply With Rule 431(b)

¶ 51        Defendant argues that the trial court failed to comply with Illinois Supreme Court Rule 431(b) (eff. July 1, 2012). The State concedes that the trial court failed to comply with this rule but argues that the error did not rise to the level of plain error.

¶ 52        Rule 431(b) requires a trial court to ask each juror whether that juror understands and accepts four basic principles: (1) that the defendant is presumed innocent, (2) that the State must prove the defendant guilty beyond a reasonable doubt, (3) that the defendant is not required to offer any evidence, and (4) that a defendant's decision not to testify cannot be held against him or her. Ill. S. Ct. R. 431(b) (eff. July 1, 2012). In the case at bar, defendant argues that the trial court failed to ask about the fourth principle and that this failure is particularly concerning since he exercised his right not to testify at trial.

¶ 53        Defendant concedes that he forfeited this claim by not raising it in the court below, but he asks this court to consider it under the plain error doctrine.

¶ 54        When a claim has been forfeited, the plain error doctrine permits us to still review it, if a clear and obvious error occurred and either (1) the evidence is so closely balanced that this

_____

[2]In *Fort*, our supreme court found "that the trial court erred in imposing an adult sentence" on a juvenile defendant. *Fort*, 2017 IL 118966, ¶ 41. The court found "that the proper resolution is to remand the cause to the trial court with directions [1] to vacate defendant's sentence," [2] to allow the State to file a petition for adult sentencing, and [3] to determine whether the juvenile defendant is subject to adult sentencing. *Fort*, 2017 IL 118966, ¶ 41.

error alone threatened to tip the scales of justice against the defendant or (2) the error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence. *People v. Sebby*, 2017 IL 119445, ¶ 48. Defendant argues error solely under the first or closely-balanced prong of the plain error doctrine. See *Sebby*, 2017 IL 119445, ¶ 52 ("A Rule 431(b) violation is not cognizable under the second prong of the plain error doctrine, absent evidence that the violation produced a biased jury."). "The initial analytical step under either prong of the plain error doctrine is determining whether there was a clear or obvious error at trial." *Sebby*, 2017 IL 119445, ¶ 49.

¶ 55     Our supreme court has found that Rule 431(b) "requires questioning on whether the potential jurors both understand and accept each of the enumerated principles." *People v. Thompson*, 238 Ill. 2d 598, 607 (2010). In the case at bar, the trial court failed to ask about the fourth principle, which constituted a clear and obvious error. *People v. Wilmington*, 2013 IL 112938, ¶ 32 (a trial court's failure to ask potential jurors about the fourth principle was clear error).

¶ 56     Although we find a clear and obvious error occurred, we cannot find plain error where defendant has failed to carry his burden to show that the evidence was closely balanced. See *Sebby*, 2017 IL 119445, ¶ 48. While a defendant has no burden at trial to present any evidence at all, a defendant does bear the burden on review when claiming plain error "to show that the evidence is closely balanced." *People v. Piatkowski*, 225 Ill. 2d 551, 567 (2007); see also *Sebby*, 2017 IL 119445, ¶ 51.

¶ 57     On the issue of what constitutes "closely balanced," defendant cites the supreme court case of *People v. Nelson*, 193 Ill. 2d 216 (2000). In *Nelson*, the defendant presented three alibi witnesses who "accounted for defendant's whereabouts." *Nelson*, 193 Ill. 2d at 222. There was

no physical evidence linking defendant to the crime, and defendant's sole "link to the crime was established through a single witness on mild sedation." *Nelson*, 193 Ill. 2d at 222-23. Reviewing this evidence, our supreme court found it "very closely balanced." *Nelson*, 193 Ill. 2d at 222. Defendant, in his brief, quotes the *Nelson* court's statement that "it can hardly be said that reasonable juries could only draw from [the evidence] a conclusion of guilt." *Nelson*, 193 Ill. 2d at 223.

¶ 58       Defendant argues that the evidence here was closely balanced because no witness testified to observing defendant shoot a gun, defendant did not confess, and no murder weapon was found. In addition, the State did not present evidence that defendant knew Clark and did not offer any motive for the shooting. Defendant argues that the only physical evidence linking defendant to the crime was the DNA evidence, but there were other unidentified DNA profiles found on the sweatshirt. Defendant argues that his DNA could have been transferred to the sweatshirt while he was in Teon's room. Mitchell, the taxi driver, could identify defendant from only one of two photos of the shooter, and Mitchell recanted at trial. As for the employees at defendant's school, only the head of security recognized the shooter as defendant. The dean of students was unsure, and defendant's physics teacher could not identify him as defendant. Defendant argues that the State's case relied primarily on circumstantial evidence.

¶ 59       While the evidence in this case was largely circumstantial, this court has often observed that a conviction "may be sustained on circumstantial evidence alone." *E.g.*, *People v. Eubanks*, 2021 IL App (1st) 182549, ¶ 38; *People v. Aljohani*, 2021 IL App (1st) 190692, ¶ 79; see also *People v. Beauchamp*, 241 Ill. 2d 1, 9 (2011). In addition, motive is not an element of the crime of murder, and the State has no burden to prove motive to sustain a murder conviction. *Aljohani*, 2021 IL App (1st) 190692, ¶ 93; *People v. Saulsberry*, 2021 IL App (2d)

181027, ¶ 49 ("the State need not prove motive to sustain a murder conviction"). Defendant argues that "a lot of closely balanced evidence creates a closely-balanced case." However, that is not necessarily so. "[A]n individual item of evidence is merely a brick, one of many bricks used to build the wall that is the fact at issue." *People v. McKown*, 236 Ill. 2d 278, 304 (2010). "Each individual item of evidence does not have to prove the fact at issue beyond a reasonable doubt" in order to contribute to a solid wall. *McKown*, 236 Ill. 2d at 304; see also *People v. Cerda*, 2014 IL App (1st) 120484, ¶ 36 ("The State's evidence" may be "in the details which form an interlocking pattern.").

¶ 60        Although the taxi driver recanted at trial, his statement confirmed that he drove defendant near the scene of the shooting, that defendant began running toward where the shooting subsequently occurred, and that the driver heard shots shortly after dropping defendant off. The surveillance videos established that the shooter, in a black hooded sweatshirt, fled the crime scene and entered Teon's building less than a minute after the shooting. Teon confirmed that defendant did, in fact, enter Teon's building that afternoon. The DNA evidence connected the black hooded sweatshirt found on Teon's bed to defendant. Gunshot residue was found on both cuffs of the sweatshirt. The head of security at defendant's school recognized defendant from a photo of the shooter. While no one piece of evidence is overwhelming, the totality firmly establishes a wall of evidence, such that we cannot find this case closely balanced.

¶ 61                          III. Course of Investigation Exception

¶ 62        Lastly, defendant claims that the trial court erred in its application of the course of investigation exception to the rule against hearsay.

¶ 63        " 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Ill. R. Evid. 801(c) (eff. Oct. 15, 2015). The rule against hearsay provides that "[h]earsay is not admissible except as provided by these rules" or by statute. Ill. R. Evid. 802 (eff. Jan. 1, 2011). After articulating the rule, our evidentiary rules then provide numerous exceptions to it pursuant to which hearsay may still be admitted. Ill. Rs. Evid., art. VIII.

¶ 64        Although commonly referred to as an "exception," statements admitted by police officers concerning the course of their investigation are not hearsay at all. *People v. Rush*, 401 Ill. App. 3d 1, 15 (2010); *People v. Armstead*, 322 Ill. App. 3d 1, 12 (2001); *People v. Sample*, 326 Ill. App. 3d 914, 920 (2001). Hearsay is limited to statements admitted "to prove the truth of the matter asserted." Ill. R. Evid. 801(c) (eff. Oct. 15, 2015). By contrast, statements made by others to officers during the course of the officers' investigation are *not* admitted for the purpose of proving the truth of the matters asserted in those statements but rather are admitted for the purpose of showing why the officers then did what they did. *Rush*, 401 Ill. App. 3d at 15; *Armstead*, 322 Ill. App. 3d at 12; *Sample*, 326 Ill. App. 3d at 920. Since the truth or falsity of these statements should not be at issue, the discussion of these statements at trial should be limited simply to the fact that a statement was made, without disclosing the content of the statement itself. See *People v. Sardin*, 2019 IL App (1st) 170544, ¶ 117.

¶ 65        This court has previously instructed trial courts: "with respect to course-of-investigation testimony, 'the testimony should be limited [1] to the fact that there was a conversation, without disclosing its content, and [2] to what the police did after the conversation concluded.' " *Sardin*, 2019 IL App (1st) 170544, ¶ 117; see also *Rush*, 401 Ill. App. 3d at 15 (normally "an officer's testimony that he acted upon information received, or

words to that effect, should be sufficient"); *Sample*, 326 Ill. App. 3d at 921. If the content of an out-of-court statement is nonetheless introduced, the trial court should " 'specifically instruct the jury' " that the statement was introduced " 'for a limited purpose' " of explaining the officers' subsequent course of investigation and " 'that the jury is not to accept the statement for the truth of its contents.' " *Rush*, 401 Ill. App. 3d at 15 (quoting *Armstead*, 322 Ill. App. 3d at 12).

¶ 66 Defendant argues that the trial court erred both in admitting certain statements and in failing to provide a limiting instruction. To these errors, defendant argues that we should apply a *de novo* review.

¶ 67 Defendant acknowledges that it is generally within the trial court's discretion to decide whether evidence is relevant and admissible. *Morgan*, 197 Ill. 2d at 455. A trial court's decision concerning whether evidence is relevant and admissible will not generally be reversed absent a clear abuse of discretion. *Morgan*, 197 Ill. 2d at 455. An abuse of discretion occurs only when the trial court's decision is arbitrary, fanciful, or unreasonable or where no reasonable person would take the trial court's view. *Morgan*, 197 Ill. 2d at 455.

¶ 68 Nonetheless, defendant argues that we should apply *de novo* review in this particular case because the issue involves interpreting the rules of evidence regarding hearsay, and interpreting the meaning of rules generally calls for *de novo* review. *E.g.*, *Robidoux v. Oliphant*, 201 Ill. 2d 324, 332 (2002) (the construction of statutes and rules is a question of law that we review *de novo*). Under *de novo* review, the reviewing court owes no deference to the trial court's judgment or reasoning and performs the same analysis that a trial judge would perform. *People v. Begay*, 2018 IL App (1st) 150446, ¶ 34.

¶ 69    We do not find defendant's argument for *de novo* review persuasive because there is no confusion here regarding what the rule embodied in Rule 801 states or what any individual word in the rule means. Ill. R. Evid. 801(c) (eff. Oct. 15, 2015); see *People v. Caffey*, 205 Ill. 2d 52, 89 (2001) (an "exception to the general rule of deference applies" only when the trial court's discretion was " 'frustrated by an erroneous rule of law' " (quoting *People v. Williams*, 188 Ill. 2d 365, 369 (1999))). The question is whether the trial court abused its discretion in applying it.

¶ 70    Defendant argues that the trial court erred in admitting, pursuant to the course of investigation doctrine, a detective's testimony about what Teon and Teon's mother told the detective regarding the black hooded sweatshirt found on Teon's bed.

¶ 71    Detective Enrique Pacheco testified that, shortly after the shooting, he interviewed Teon and his mother, Fredericka, at their apartment. Detective Pacheco asked Teon for identification and followed Teon to his bedroom as Teon went to obtain his identification. In Teon's bedroom, Detective Pacheco observed a black hooded sweatshirt on the bed. Detective Pacheco testified that, when he asked Teon if the sweater belonged to him, Teon "wasn't able to give *** an explanation as to how" it "got there or that it was his." The defense objected, and the trial court overruled the objection.

¶ 72    Detective Pacheco testified that, while wearing latex gloves, he "took the sweatshirt down to show it to" Teon's mother, Fredericka, "and she was not able to—." At that point, defense counsel interjected: "Objection. This is all hearsay." The trial court stated: "Overruled in regards to the course of investigation. Overruled. You may continue with your answer." Detective Pacheco continued: "She was not able to give me an explanation how that got in her son's bedroom and said that it did not belong to anybody in that house." Defense counsel again

objected, and that trial court again overruled the objection. Detective Pacheco testified that he submitted the sweatshirt for DNA and gunshot residue testing.

¶ 73    The State argues that the trial court did not abuse its discretion because the objected-to statements were cumulative to evidence already admitted at trial. Prior to Detective Pacheco's testimony, Teon testified that, on the day of the offense, he did not place a black hooded sweatshirt on his bed.

¶ 74    We do not find this argument persuasive because, while Teon testified that he did not place a black hooded sweatshirt on his bed, the statement provided by Detective Pacheco supplies more information. Detective Pacheco reported that Teon was unable to provide an explanation of how the sweatshirt wound up on his bed or "that it was his." In addition, Detective Pacheco reported that Fredericka asserted that no one living in her house owned that sweatshirt. However, Fredericka did not testify at trial, and no one at trial but Detective Pacheco testified to the effect that no one living in her house owned that sweatshirt. On the witness stand, Teon did not deny or admit ownership of the sweatshirt; rather, he denied placing it on his bed on the day of the offense. Thus, we do not find persuasive the State's argument that the substance of the objected-to statements was already in evidence at trial.

¶ 75    We find that the admission of the out-of-court statements went beyond what was required to explain the officer's course of investigation. The relevance of a black hooded sweatshirt was already established by the surveillance video of the shooting, which showed the shooter wearing a black hooded sweatshirt, and Teon had already testified and denied that he placed the sweatshirt on the bed that day. No further explanation was required in order for the jury to comprehend why the officer was seizing the sweatshirt with latex gloves and submitting it for gunshot and DNA testing.

22

¶ 76    The State argues that the any error was harmless. Generally, a defendant forfeits review of an error if he does not both object at trial and raise the issue in a posttrial motion. *Piatkowski*, 225 Ill. 2d at 564. In the case at bar, defendant preserved the issue for our review, by objecting to the admission of the out-of-court statements during trial and raising the issue again in a posttrial motion. We quoted above defendant's objections at trial; and defendant quoted these same questions and answers in his posttrial motion, thereby preserving the issue for our review on appeal. When a defendant preserves an issue for review, "the reviewing court conducts a harmless-error analysis in which the State has the burden of persuasion with respect to prejudice." *People v. McLaurin*, 235 Ill. 2d 478, 495 (2009) (citing *People v. Herron*, 215 Ill. 2d 167, 181 (2005)). " 'In other words, the State must prove beyond a reasonable doubt that the jury verdict would have been the same absent the error.' " *Herron*, 215 Ill. 2d at 181-82 (quoting *People v. Thurow*, 203 Ill. 2d 352, 363 (2003)).

¶ 77    Admission of hearsay is harmless if there is no "reasonable possibility the verdict would have been different had the hearsay been excluded." (Internal quotation marks omitted.) *Sample*, 326 Ill. App. 3d at 925.

¶ 78    In the instant case, the out-of-court statements concerned the ownership of the sweatshirt. However, no matter who owned the sweatshirt, there was still only one major DNA profile suitable for comparison and that one profile belonged to defendant. The profile was not on the outside of the sweatshirt, but on the inside collar, where the wearer of the shirt would have been likely to make contact with it. Megan Neff, a forensic DNA analyst with the Illinois State Police,[3] testified that it was "likely" that someone who wore a sweatshirt throughout the

_____

[3]Neff was tendered by the State "as an expert in the field of forensic DNA analysis" and accepted as an expert without objection by the defense.

23

course of a day and ran while wearing it would "leave behind DNA on the collar." Neff further testified that, if the sweatshirt was worn "right side out" and "put down" on the bed that way, then she "wouldn't expect" another's "DNA to be transferred to the inside of it." Even if someone else owned the sweatshirt, the DNA analysis firmly established a connection between defendant, on the one hand, and the wearing of the sweatshirt, on the other hand. Thus, we find there was no reasonable possibility that the verdict would have been different had the hearsay been excluded. *Sample*, 326 Ill. App. 3d at 925.

¶ 79 Defendant further argues that the trial court erred by failing to provide *sua sponte* a limiting instruction regarding the admitted out-of-court statements. However, this issue is forfeited because defendant did not request a limiting instruction at trial. *Rush*, 401 Ill. App. 3d at 16 ("at no time did defense counsel request a limiting instruction" regarding course of investigation testimony "and, therefore, the matter is waived"). When a claim has been forfeited, the plain error doctrine permits us to still review it, if a clear and obvious error occurred and either (1) the evidence is so closely balanced that this error alone threatened to tip the scales of justice against the defendant or (2) the error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence. *Sebby*, 2017 IL 119445, ¶ 48. Having found that the admission of the statements themselves was harmless, we cannot find that the lack of a limiting instruction regarding those same statements rose to the level of plain error.

¶ 80                                              CONCLUSION

¶ 81 For the foregoing reasons, we do not find defendant's arguments persuasive and must affirm his conviction and sentence.

¶ 82 Affirmed.

**No. 1-19-2509**

| | |
|---|---|
| **Cite as:** | *People v. Harris*, 2022 IL App (1st) 192509 |
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 16-CR-18865; the Hon. Maura Slattery Boyle and the Hon. Stuart P. Katz, Judges, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Andrew Thomas Moore (Joseph Crawford, law student), of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Enrique Abraham, Matthew Connors, and Noah Montague, Assistant State's Attorneys, of counsel), for the People. |